**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No.  11-3257
_____

In Re:  PHILADELPHIA NEWSPAPERS, LLC, et al.

Debtors

Vahan H. Gureghian,
Danielle Gureghian, and
Charter School Management, Inc.,

Appellants
_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Action No. 2-10-cv-07098)
District Judge: Honorable Eduardo C. Robreno
_____

Argued May 23, 2012

Before: AMBRO, FUENTES,
and HARDIMAN, Circuit Judges

(Opinion filed July 26, 2012)

David A. Barnes, Esquire (Argued)
Edmond M. George, Esquire
Obermayer, Rebmann, Maxwell & Hippel
1617 John F. Kennedy Boulevard
One Penn Center, 19th Floor
Philadelphia, PA   19103-0000

      Counsel for Appellants

David F. Abernethy, Esquire
Andrew J. Flame, Esquire
Andrew C. Kassner, Esquire
Drinker, Biddle & Reath
18th & Cherry Streets
One Logan Square, Suite 2000
Philadelphia, PA  19103-0000

Fred S. Hodara, Esquire
Abid Qureshi, Esquire
Sunish Gulati, Esquire (Argued)
Akin, Gump, Strauss, Hauer & Feld
One Bryant Park, 42nd Floor
New York, NY   10036

      Counsel for Appellee

Anne M. Aaronson, Esquire
Christie C. Comerford, Esquire
Lawrence G. McMichael, Esquire
Catherine G. Pappas, Esquire
Laura E. Vendzules, Esquire

Dilworth Paxson
1500 Market Street, Suite 3500E
Philadelphia, PA   19102

Richard J. Corbi, Esquire
Michael T. Mervis, Esquire
Allison Meyer, Esquire
Proskauer Rose
Eleven Times Square, 17th Floor
New York, NY   10036-8299

Paul V. Possinger, Esquire
Mark K. Thomas, Esquire
Peter J. Young, Esquire
Proskauer Rose
70 West Madison, Suite 3800
Chicago, IL   60602-4342

John M. Elliott, Esquire
Mark J. Schwemler, Esquire
Elliott Greenleaf & Siedlkowski
925 Harvest Drive, Suite 300
Union Meeting Corporate Center V
Blue Bell, PA   19422-0000

     Counsel for Debtors

_____

OPINION OF  THE  COURT
_____

AMBRO, Circuit Judge

Vahan H. Gureghian, Danielle Gureghian, and Charter School Management, Inc. (collectively, the "CSMI Parties") appeal from the judgment of the District Court affirming the Bankruptcy Court's decision to deny the CSMI Parties' requests for the allowance of administrative expense claims under 11 U.S.C. § 503(b) in the Chapter 11 bankruptcy proceedings of Philadelphia Newspapers, LLC and certain of its affiliates (collectively, the "Debtors").[1] In affirming the Bankruptcy Court's decision, the District Court held that the appeal was equitably moot, and alternatively that the CSMI Parties failed to establish their entitlement to administrative expense claims. Though we hold that the appeal is not equitably moot, we affirm the District Court's judgment based on its conclusions regarding the administrative expense requests.

## I. Background

Bankruptcy Court Proceedings

This appeal relates to a defamation action filed by the CSMI Parties against Philadelphia Media Holdings, LLC (one of the Debtors), The Philadelphia Inquirer, and several Inquirer employees in the Court of Common Pleas of Delaware County,

---

[1] The Debtors are PMH Acquisition, LLC, Broad Street Video, LLC, Philadelphia Newspapers, LLC, Philadelphia Direct, LLC, Philly Online, LLC, PMH Holdings, LLC, Broad Street Publishing, LLC, Philadelphia Media, LLC, and Philadelphia Media Holdings, LLC.

4

Pennsylvania. The action concerns certain articles published in print and online by the Inquirer discussing the CSMI Parties' contract management of the Chester Community Charter School (the "Articles"). After the filing of the action, the Debtors filed for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* The CSMI Parties assert that post-petition the Debtors published an article that links to and endorses the Articles. On August 2, 2010, they timely filed the administrative expense requests based on these allegations.[2]

Specifically, the CSMI Parties alleged that pre-petition the Debtors published a charter school webpage (the "Charter Page") that contained links to various items published by the Inquirer about charter schools, including the Articles.[3] They claimed that these links endorsed the Articles as accurate reporting and misled the public into believing that the CSMI Parties engaged in wrongdoing similar to the improper or illegal conduct alleged in other linked news items. They also highlighted that the Articles were displayed beneath the Charter Page's title bar as a "marquee" enclosed in a separate box containing photographs, thereby drawing attention to the Articles.

[2] The CSMI Parties filed one request in each of the Debtors' proceedings.

[3] The CSMI Parties' statements in the materials supporting the administrative expense requests implied that the Charter Page was published for the first time post-petition. At the hearing before the Bankruptcy Court on the requests, the Debtors introduced evidence that the Charter Page was created pre-petition and had not been modified post-petition. Before the District Court and us, the CSMI Parties abandoned their assertion about the initial publication date of the Charter Page.

They further alleged that post-petition the Debtors published an editorial article titled "Not the Lessons Charters Were Supposed to Teach" by Inquirer columnist Monica Yant Kinney (the "Kinney Article"). It contained a link to and a statement endorsing the Charter Page. The Kinney Article read: "Some city charter schools – think Mastery, KIPP, Independence, Young Scholars – are soaring. But if you follow the remarkable reporting of my colleague Martha Woodall (http://go.philly.com/charter), you'll see greedy grown-ups pilfering public gold under the guise of enriching children's lives." The CSMI Parties argue that this link and statement "republished" the Articles.[4]

Each administrative expense request asserted an estimated claim of $1,800,000 for the Debtors' alleged post-petition act of defamation. Each also sought $147,140 in alleged damages for the Debtors' post-petition conduct and prosecution of claims against the CSMI Parties.[5]

---

[4] The CSMI Parties did not include this argument in the materials supporting the administrative expense requests. Rather, they first mentioned the Kinney Article in their response to the Debtors' objection to the requests. The parties agree that the Bankruptcy Court properly considered this argument.

[5] The $147,140 is for legal costs related to adversary proceedings before the Bankruptcy Court seeking to stay the prosecution of the Pennsylvania state court action regarding the Articles. The CSMI Parties do not present any arguments on appeal regarding these fees, nor did they do so in the District Court.

Three weeks after the CSMI Parties made the administrative expense requests, the Debtors filed on August 23 an objection to the requests along with a motion for an expedited hearing. The next day, the CSMI Parties objected to the Debtors' motion to expedite. The Bankruptcy Court held a hearing on the motion to expedite on August 26. At that hearing, the Debtors stated that they requested an expedited hearing because the closing under the then-current version of the Debtors' confirmed plan of reorganization[6] was scheduled to take place on August 31, and reserving $1.8 million for the requests would affect adversely their post-closing working capital.[7] The Bankruptcy Court granted the motion to expedite and scheduled an evidentiary hearing for August 30.

Bankruptcy Judge Stephen Raslavich also made preliminary statements regarding the administrative expense requests. He noted that he could

---

[6] The Bankruptcy Court confirmed the Fourth Amended Joint Chapter 11 Plan (the "Fourth Amended Plan") at the end of June 2010. It contemplated a sale of substantially all of the Debtors' assets for a "base purchase price" of $105 million in cash. Under the asset purchase agreement, this cash was to be delivered to the entity designated to distribute funds to holders of claims under the Fourth Amended Plan.

[7] The agreement for the purchase of substantially all of the Debtors' assets provided that the purchaser would assume certain administrative expense claims, the definition of which did not include the claims arising from the CSMI Parties' administrative expense requests.

> detect virtually no merit to this assertion of an administrative expense claim. . . . I didn't want to mislead you as to what my preliminary sense of this is . . . . [I]t's going to take an enormous amount of persuading to convince me that the allegations of damage . . . [provide] some kind of [ongoing] recoverable damage in the nature of a bankruptcy estate administrative claim.

Nonetheless, the Judge worked with the CSMI Parties to establish an acceptable hearing date and time.

At the hearing on the Debtors' objection to the administrative expense requests, Judge Raslavich, after hearing testimony and oral argument, denied the requests. He held that the CSMI Parties had not sustained their burden of proof in establishing entitlement to an administrative expense claim. The CSMI Parties timely appealed to the District Court on September 10.

The closing did not take place as anticipated because of failed negotiations with the Debtors' labor unions, the acceptable completion of which was a condition to closing. The Debtors conducted another auction of substantially all of their assets on September 23, and the sale was consummated under the terms of the Fifth Amended Joint Chapter 11 Plan (the "Fifth Amended Plan" or "Plan") for a purchase price of $105 million in cash.[8]

---

[8] The Bankruptcy Court confirmed the Fifth Amended Plan at the end of September 2010. Similar to the agreement accompanying the Fourth Amended Plan, the final agreement

District Court Decision

Before the District Court, the CSMI Parties argued that the Bankruptcy Court erred in denying the administrative claims requests because the Kinney Article's link and reference to the Charter Page provided a post-petition tort claim. They also asserted that the Bankruptcy Court prejudged the merits of the requests and infringed on their due process rights by forcing them to proceed on an expedited basis. The Debtors argued that the appeal should be dismissed as equitably moot.[9]

The District Court held that the appeal was equitably moot, "as the plan has been substantially consummated and no stay was sought," but nonetheless considered the merits. After noting that courts often provide their preliminary impressions on matters to narrow issues and that expedited hearings are

for the purchase of substantially all of the Debtors' assets provided that the purchaser would assume certain administrative expense claims, whose definition did not include the claims arising from the CSMI Parties' administrative expense requests. It also similarly provided that the "base purchase price" of $105 million in cash would be delivered to the entity designated to distribute funds to holders of claims under the Fifth Amended Plan.

[9] Before the District Court (per Judge Eduardo Robreno), the Appellee was Philadelphia Media Network Inc., which under the Plan, as purchaser of substantially all of the Debtors' assets, possesses the rights of a party in interest for all matters related to the Debtors' Chapter 11 cases. Before us, Philadelphia Media Network Inc. remains the Appellee. For convenience, we refer to the Debtors when discussing the Appellee.

"commonplace and often necessary" in bankruptcy proceedings, it considered the claims underlying the administrative expense requests. It affirmed the Bankruptcy Court's denial of the requests based on its holding that "merely post[ing] a link to the charter school webpage that contained the original articles . . . , as the courts that have had occasion to consider this issue have uniformly held, is not distinct tortious conduct upon which a defamation claim can be grounded."

In addition to advancing the same arguments regarding the Bankruptcy Court's actions and decisions as they did before the District Court, the CSMI Parties argue to us that the District Court erred in holding that the appeal is equitably moot.

## II. Jurisdiction and Standard of Review

The Bankruptcy Court had jurisdiction under 28 U.S.C. § 157(b). The District Court had jurisdiction under 28 U.S.C. §§ 158(a) and 1334. We have jurisdiction under 28 U.S.C. §§ 158(d) and 1291.

Our precedent requires us to review for abuse of discretion a district court's decision that an appeal is equitably moot. *In re Cont'l Airlines*, 91 F.3d 553, 560 (3d Cir. 1996) (en banc) ("*Continental I*").[10] Because a district court sits as an

[10] Then Circuit Judge Alito criticized this standard of review as contradicting our precedent that where the district court sits as an appellate court, we exercise plenary review. *Continental I*, 91 F.3d at 568 n.4 (Alito, J., dissenting) ("We are essentially called on to review whether the district court properly decided not to reach the merits of the . . . appeal. We are in just as good

appellate court to review a bankruptcy court, we review a bankruptcy court's "legal determinations *de novo*, its factual findings for clear error, and its exercises of discretion for abuse thereof." *In re Goody's Family Clothing Inc.*, 610 F.3d 812, 816 (3d Cir. 2010).

### III.  Equitable Mootness

Equitable mootness is a way for an appellate court to avoid deciding the merits of an appeal.  In this uncommon act, a court dismisses an appeal even if it has jurisdiction and can grant relief if "implementation of that relief would be inequitable." *Continental I*, 91 F.3d at 559 (quoting *In re Chateaugay Corp.*, 988 F.2d 322, 325 (2d Cir. 1993)).  The term "mootness" is a misnomer.  Unlike mootness in the constitutional sense, where it is impossible for a court to grant any relief, "mootness" here is used "as a shortcut for a court's decision that the *fait accompli* of a plan confirmation should preclude further judicial proceedings." *Id.*

A court arrives at this decision through the application of "prudential" considerations that address "concerns unique to bankruptcy proceedings." *Id.*  These concerns relate to the adverse effects of the unraveling of a confirmed plan that could result from allowing the appeal to proceed.  The equitable mootness doctrine recognizes that if a successful appeal would be fatal to a plan, prudence may require the appeal be dismissed because granting relief to the appellant "would lead to a perverse outcome." *United States Tr. v. Official Comm. of*

a position to make this determination as was the district court, which sat as an appellate court in this case.").  He stated: "[P]lenary review would better serve these ends." *Id.*

11

*Equity Sec. Holders (In re Zenith Elecs. Corp.)*, 329 F.3d 338, 343 (3d Cir. 2003). A "perverse outcome" often involves injury to third parties, particularly investors, who have relied on the confirmed plan, *see Nordhoff Invs. Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 184 (3d Cir. 2001) ("One inequity, in particular, that is often at issue is the effect upon innocent third parties. When transactions following court orders are unraveled, third parties not before us who [took actions] in reliance on those orders will likely suffer adverse effects."), or the potential for chaos in the bankruptcy court, *see Continental I*, 91 F.3d at 560–61 (citing *In re Robert Farms*, 652 F.2d 793 (9th Cir. 1981)) (reversal of the plan's confirmation would "create an unmanageable, uncontrollable situation for the Bankruptcy Court").

The "prudential" factors we consider in evaluating equitable mootness are the following:

> (1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments.

*Continental I*, 91 F.3d at 560. "These factors are given varying weight, depending on the particular circumstances." *In re PWS Holding Corp.*, 228 F.3d 224, 236 (3d Cir. 2000).

The first factor, typically "the foremost consideration," *id.*, requires that a court consider whether allowing an appeal to

12

go forward will undermine the plan, and not merely whether the plan has been substantially consummated under the Bankruptcy Code's definition.[11] *See, e.g.*, *Zenith Elecs.*, 329 F.3d at 343–44 (holding that the district court abused its discretion in finding the appeal equitably moot because it merely determined that the plan had been substantially consummated in a definitional sense and did not provide a complete analysis of the first factor); *United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.)*, 315 F.3d 217, 228 (3d Cir. 2003) (holding that the substantial consummation factor weighed against equitable mootness, despite the plan satisfying the Bankruptcy Code's definition, because the relief sought "does not undermine the Plan's foundation"); *PWS Holding*, 228 F.3d at 236 (declining to dismiss an appeal seeking alterations to a confirmed plan as equitably moot because a successful appeal would not "knock the props out from under the authorization for every transaction that has taken place" (quoting *In re Chateaugay Corp.*, 167 B.R. 776, 780 (S.D.N.Y. 1994))).

The second factor principally duplicates the first "in the sense that a plan cannot be substantially consummated if the appellant has successfully sought a stay." *Zenith Elecs.*, 329 F.3d at 346 n.4. Thus this factor "should only weigh heavily against the appellant if, by a failure to secure a stay, a reorganization plan was confirmed, the existence of which is later threatened by the appellant's appeal." *Id. See also United*

---

[11] The Bankruptcy Code defines "substantial consummation" as: "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan." 11 U.S.C. § 1101(2).

13

*Artists*, 315 F.3d at 228 (noting that failure to seek a stay weighed against appellant, but "because the remedy [appellant] seeks does not undermine the Plan's foundation, this omission is not fatal"); *Nordhoff Invs. Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 186–87 (3d Cir. 2001) ("[I]t 'is obligatory upon appellant . . . to pursue with diligence all available remedies to obtain a stay of execution of the objectionable order . . . *if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.*'" (emphasis added) (quoting *In re Highway Truck Drivers & Helpers Local Union No. 107*, 888 F.2d 293, 297 (3d Cir. 1989))).

The third factor asks to what extent the relief sought would adversely affect parties not before the court. Stated differently, "[h]igh on the list of prudential considerations . . . is the reliance of third parties, in particular investors, on the finality of the transaction." *Continental I*, 91 F.3d at 562. The fourth factor largely replicates the analysis of the first in that it considers whether granting the appellant the requested relief would unravel the plan. *See Nordhoff Invs.*, 258 F.3d at 189. Finally, the fifth factor supports the other four by encouraging investors and others to rely on confirmation orders, thereby facilitating successful reorganizations by fostering confidence in the finality of confirmed plans. *See id.* at 190; *Continental I*, 91 F.3d at 565 ("[T]he importance of allowing approved reorganizations to go forward in reliance on bankruptcy court confirmation orders may be the central animating force behind the equitable mootness doctrine.").

Taken together, these factors recognize that a court only should apply the equitable mootness doctrine if doing so will "unscrambl[e] complex bankruptcy reorganizations when the appealing party should have acted before the plan became extremely difficult to retract." *Nordhoff Invs.*, 258 F.3d at 185.

14

The doctrine is quite rightly "limited in scope" and "cautiously applied."[12]  *Continental I*, 91 F.3d at 559.

In holding that the appeal is equitably moot, the District Court seemingly relied on the Plan's substantial consummation under the Bankruptcy Code's definition.  We discern no analysis of whether a ruling favorable to the CSMI Parties would upset the Plan.  The Court also faulted the CSMI Parties for not seeking a stay without explaining whether a stay was critical given the progression of the Debtors' bankruptcy proceedings.  Moreover, it did not include any analysis of the final three factors.

---

[12] In *Continental I*, our court sitting *en banc* invoked the equitable mootness doctrine by a narrow 7-6 margin.  As referenced above, then Judge Alito dissented, and was joined by five judges.  For the dissenters, the extraordinary nature of the equitable mootness doctrine required, at the very least, a more limited application than the majority provided in weighing the five factors it set out.  *Continental I*, 91 F.3d at 567 (Alito, J., dissenting).  Indeed, the majority did not "undertake an independent analysis of the origin or scope of the doctrine," but simply assumed its existence and adopted it as our own.  *Id.* at 568.  This resulted in an unjustifiably expansive doctrine that "can easily be used as a weapon to prevent any appellate review of bankruptcy court orders confirming reorganization plans.  It thus places far too much power in the hands of bankruptcy judges." *Nordhoff Invs.*, 258 F.3d at 191 (Alito, J., concurring); *see also Continental I*, 91 F.3d at 568-71 (Alito, J., dissenting).

15

In our view, a balancing of the equitable mootness factors calls for allowing this appeal to proceed. Though the Plan was substantially consummated in a definitional sense after the Bankruptcy Court denied the administrative expense requests, a ruling in favor of the CSMI Parties will not upset the Plan. It provides that administrative expense claims will be paid on the later of the Plan's effective date or the date on which the claims become allowed. It also establishes an account from which a designated entity is to distribute funds to holders of allowed administrative expense claims as provided by the Plan. If the CSMI Parties' administrative expense requests are allowed, they may be paid under the Plan without upsetting it.

Indeed, on appeal the Debtors do not argue that allowance of the requests will undermine the Plan. Also, under the agreement for the purchase of substantially all of the Debtors' assets and the Plan, the Debtors are responsible for paying the requests if they are allowed. These facts make this appeal unlike *Continental I*, in which the debtor entered into an agreement with investors premised on the limitation of the amount of administrative expense claims that the investors would assume. That agreement was incorporated explicitly into the confirmed plan. 91 F.3d at 556. A holding in favor of the appellant would have provided for an additional (and sizable) administrative expense claim that the investor would be required to assume, and thus arguably would have upset the plan. Here, the administrative expense requests were not part of the purchaser's calculus at the time of the sale and their allowance, only 1.7% of the monies ($105 million) coming into the Debtors' estates from the purchase of their assets consummated under the terms of the Fifth Amended Plan, will not unravel the sale or the Plan.

In addition, at the time of the Bankruptcy Court's ruling on the administrative expense requests, the then-current plan (the Fourth Amended Plan) already had been confirmed. The closing on that plan, scheduled for a day after the hearing on the requests, did not occur. Instead the Fourth Amended Plan became moot (pun intended) when the Fifth Amended Plan was confirmed a month later.

Though perhaps the CSMI Parties should have sought a stay of the order confirming the Fifth Amended Plan, given the timing of their appeal during the progression of Debtors' bankruptcy proceedings, they need not be faulted unduly for failing to do so. Moreover, the CSMI Parties' appeal of the Bankruptcy Court's disallowance of its requests categorized the requests as disputed administrative expense claims. Under the Plan, the Debtors should have set aside sufficient funds in the distribution account to fulfill the requests if the CSMI Parties prevailed on appeal and the requests later became allowed claims. As such, the CSMI Parties' posting of a bond was not critical to the Debtors or the entities designated to administer the Plan.

As concerns the rights of parties not before us (the third factor), the Bankruptcy Code and the Plan establish priority of payment among the Debtors' creditors. The latter provides a mechanism for payment of disputed administrative expense claims if they are deemed allowed claims. *See* Plan §§ 5.04, 7.09, 7.11, 7.13 (establishing the distribution account, and detailing powers and duties of the liquidating trustee and distribution agent). No doubt the appeal can proceed without causing substantial harm to other creditors. In this context, it is hard to say that the Plan's success, the fourth factor, will be affected.

Accordingly, the first four factors weigh in favor of allowing the appeal to proceed. Though the finality of the Bankruptcy Court's decision necessarily will be disturbed, because a holding in favor of the CSMI Parties on appeal will not unscramble the Plan or upset the rights of other parties, we honor the CSMI Parties' statutory right to review of the Court's decision. We thus hold that the appeal is not equitably moot.

## IV. The Bankruptcy Court's Handling of the Administrative Expense Requests

Expedited Hearing

The CSMI Parties argue that the expedited hearing on August 30, 2010, violated their due process rights and that the Bankruptcy Court abused its discretion in holding the hearing on such an expedited basis. We review due process claims *de novo*. *Fadiga v. Att'y Gen.*, 488 F.3d 142, 154 (3d Cir. 2007).

Due process generally requires notice and an opportunity to be heard. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993). The CSMI Parties received notice of the hearing on the Debtors' objection to the administrative expense requests a week before the hearing took place. They also were given the opportunity to be heard at the hearing on the motion to expedite. At that hearing, the Bankruptcy Court asked them to propose a schedule (taking into account the scheduled closing).

Under Fed. R. Bankr. P. 9006(c), "for cause shown" a bankruptcy court has the discretion to set an expedited schedule for the hearing of a substantive motion. In exercising that

18

discretion, it should consider the prejudice to parties entitled to notice and weigh this against the reasons for hearing the motion on an expedited basis. *See In re Grant Broad. of Phila., Inc.*, 71 B.R. 390, 397 (Bankr. E.D. Pa. 1987). The Debtors stated that they needed to resolve the administrative expense requests before the closing under the then-current Fourth Amended Plan. The CSMI Parties' requests were for $1.8 million, small relative to the proposed purchase price under the agreement accompanying the Fourth Amended Plan. However, the CSMI Parties had a week to prepare for the expedited hearing. This was sufficient time for them to ready witness testimony and draft a detailed twelve-page brief in opposition to the Debtors' objection to the requests. At the hearing, they presented this testimony and expounded on their written arguments regarding the requests.

Given the accelerated time frame of bankruptcy proceedings and the facts before us, we conclude that the CSMI Parties were given more than adequate time to prepare for the expedited hearing. *See Hester v. NCNB Nat'l Bank (In re Hester)*, 899 F.2d 361, 364 n.3 (5th Cir. 1990) ("[M]otions for material reductions in the notice period are routinely granted by bankruptcy courts."). The Bankruptcy Court did not abuse its discretion in hearing the Debtors' objection to the requests on an expedited basis and the expedited hearing did not violate the CSMI Parties' due process rights.

Preliminary Statements At Hearing On Motion to Expedite

The CSMI Parties argue that Judge Raslavich made improper premature conclusions at the August 26, 2010, hearing on the Debtors' motion to expedite. As the District Court noted, judges often inform parties of their preliminary impressions to

narrow issues and assist the parties in focusing both themselves and the court. *See, e.g.*, *Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 285 B.R. 148, 158 (Bankr. D. Del. 2002) (giving preliminary views as to the appointment of a Chapter 11 trustee before denying the motion to appoint a trustee "at this time"). The CSMI Parties elected to proceed, and Judge Raslavich held an evidentiary hearing during which they had an opportunity to present their full case. This included arguments regarding the Kinney Article that they raised for the first time in response to the Debtors' objection, which was filed after the hearing on the motion to expedite. Indeed, the CSMI Parties focused on the Kinney Article during the August 30 hearing and their arguments regarding the Kinney Article served as the primary basis of their appeal to the District Court and to us. Thus Judge Raslavich's comments at the August 26 hearing on the motion to expedite served their purpose. In giving the CSMI Parties a preview of what they needed to do to counteract his pre-hearing impressions, which certainly were not irrevocable, he encouraged the CSMI Parties to develop additional arguments. Most counsel would prize such insights.

Moreover, at the end of the August 30 hearing, Judge Raslavich articulated his reasoning for sustaining the Debtors' objection, specifically noting case law cited in the CSMI Parties' written response to the Debtors' objection. With this background, we can hardly conclude that his candid preliminary comments at the August 26 hearing on the motion to expedite prejudiced the CSMI Parties.

20

## V.  Administrative Expense Requests

Administrative Expense Claims Under the Bankruptcy Code

Section 503 of the Bankruptcy Code provides that, "[a]fter notice and a hearing, there shall be allowed administrative expenses, . . . including—(1)(A) the actual, necessary costs and expenses of preserving the estate . . . ." 11 U.S.C. § 503(b).  For a claim to be entitled to administrative expense status, it must "arise from a [post-petition] transaction with the debtor-in-possession," and "be beneficial to the debtor-in-possession in the operation of the business."  *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 532–33 (3d Cir. 1999).  The party asserting an administrative expense claim bears the burden of demonstrating that it deserves administrative expense status.  *Id.* at 533.

The Supreme Court has held that fairness may call for the allowance of post-petition tort claims as administrative expenses if those claims arise from actions related to the preservation of a debtor's estate despite having no discernable benefit to the estate.  *Reading Co. v. Brown*, 391 U.S. 471, 477 (1968) (deeming costs from fire damage resulting from the negligent actions of the bankruptcy receiver acting in the scope of his authority an "actual and necessary" expense of reorganization).  Based on *Reading*, courts in our Circuit have granted requests for administrative expense claims arising from a variety of tort actions.  *See, e.g.*, *In re B. Cohen & Sons Caterers, Inc.*, 143 B.R. 27 (E.D. Pa. 1992) (granting an administrative expense claim for injuries resulting from a slip and fall while on the debtor's premises); *In re Hayes Lemmerz Int'l, Inc.*, 340 B.R. 461 (Bankr. D. Del. 2006) (granting an administrative expense

21

claim to the lessor of machines that the debtor-lessee returned damaged where the damage occurred post-petition); *In re Women First Healthcare, Inc.*, 332 B.R. 115 (Bankr. D. Del. 2005) (granting the stalking horse bidder an administrative expense claim as compensation for its reliance on the debtor's negligent misrepresentations regarding the sale). Also based on *Reading*, courts in other jurisdictions have denied administrative expense requests where the alleged tort claims were speculative or too strained to be considered related to the preservation of a debtor's estate. *See, e.g.*, *In re Aspen Limousine Serv., Inc.*, 193 B.R. 325 (D. Colo. 1996) (holding that asserted antitrust damages were too speculative as to their amount and unrelated to the preservation of the debtor's estate); *In re Pacesetter Designs, Inc.*, 114 B.R. 731 (Bankr. D. Colo. 1990) (granting administrative expense status to certain medical expenses resulting from an injury to an employee of the debtor-in-possession, but disallowing other expenses as "too strained" and "too disparate with the language and intent of the Bankruptcy Code" to be considered costs of administration).

In *Pa. Dep't of Envtl. Res. v. Tri-State Clinical Labs., Inc.*, 178 F.3d 685 (3d Cir. 1999), we discussed *Reading* in the context of whether a criminal fine for post-petition waste management violations was an administrative expense under Chapter 7. We observed that the Supreme Court's concept of "necessary costs" as including expenses incident to the preservation of a debtor's estate advances the language of § 503(b). "[R]ead as a whole, [it] suggests a quid pro quo pursuant to which the estate accrues a debt in exchange for some consideration necessary to the operation or rehabilitation of the estate." *Id.* at 690–91. With this case law context, we turn to the CSMI Parties' alleged tort, and whether it is eligible for administrative expense status.

22

Alleged Tort

For the CSMI Parties to be entitled to administrative expense claims, they must demonstrate that their allegations regarding the "republishing" of the Articles support a cause of action. To state a cause of action for defamation under Pennsylvania law, a plaintiff must establish: "(1) the defamatory character of the communication; (2) its publication by the defendant; (3) a reference to the plaintiff; (4) a recipient's understanding of the communication's defamatory character and its application to plaintiff; (5) special harm resulting from the publication; and (6) abuse of any conditional privilege." *Iafrate v. Hadesty*, 621 A.2d 1005, 1006 (Pa. Super. Ct. 1993) (quoting *Smith v. Wagner*, 588 A.2d 1308, 1311 (Pa. Super. Ct. 1991)). The statute of limitations for defamation claims is one year from the date of publication. 42 Pa. Cons. Stat. § 5523. To avoid the potential for endless re-triggering of the statute of limitations, Pennsylvania has adopted the "single publication rule," which holds that for purposes of the statute of limitations "any one edition of a book or newspaper, or any one radio, television broadcast, exhibition of a motion picture or similar aggregate communication is a single publication." *Graham v. Today's Spirit*, 468 A.2d 454, 457 (Pa. 1983) (quoting *Restatement (Second) of Torts* § 577(A)(3)); *see also* 42 Pa. Cons. Stat. § 341(b). Under this rule, "it is the original printing of the defamatory material and not the circulation of it which results in a cause of action." *Graham*, 468 A.2d at 457.

Pennsylvania courts have not considered whether the single publication rule applies to Internet publication. Other courts addressing Internet-based defamation have found the rule applicable to information widely available on the Internet. Noting that "[c]oncerns regarding the rapid pace of changes in the way information is disseminated, the desire to avoid

23

multiplicity of suits and the need to give effect to relevant Statutes of Limitation . . . gave rise to the single publication rule," those courts reason that there is "no rational basis upon which to distinguish publication of a book or report through traditional printed media and publication through electronic means . . . ." *Firth v. State*, 706 N.Y.S.2d 835, 843 (N.Y. Ct. Cl. 2000), *aff'd* 775 N.E.2d 463 (N.Y. Ct. App. 2002); *see also Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, 512 F.3d 137, 144 (5th Cir. 2007) ("Every court to consider the issue after *Firth* has followed suit in holding that the single publication rule applies to information widely available on the Internet."); *Oja v. U.S. Army Corps of Eng'rs*, 440 F.3d 1122, 1131 (9th Cir. 2006). We believe that Pennsylvania courts would extend the single publication rule to publicly accessible material on the Internet based on similar reasoning.

An exception to the single publication rule is the doctrine of republication. Republishing material (for example, the second edition of a book), editing and reissuing material, or placing it in a new form that includes the allegedly defamatory material, resets the statute of limitations. *Restatement (Second) of Torts* § 577(A); *Davis v. Mitan (In re Davis)*, 347 B.R. 607, 611 (W.D. Ky. 2006). Traditional principles of republication thus require the retransmission of the allegedly defamatory material itself for the doctrine to apply. However, courts addressing the doctrine in the context of Internet publications generally distinguish between linking, adding unrelated content, or making technical changes to an already published website (which they hold is not republication), and adding substantive material related to the allegedly defamatory material to an already published website (which they hold is republication). *See Davis*, 347 B.R. at 611–12.

Several courts specifically have considered whether linking to previously published material is republication. To date, they all hold that it is not based on a determination that a link is akin to the release of an additional copy of the same edition of a publication because it does not alter the substance of the original publication. *See, e.g.*, *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. 02-02258, 2007 WL 935703 (S.D. Cal. Mar. 7, 2007); *Churchill v. State of N.J.*, 876 A.2d 311 (N.J. Super. Ct. 2005).

Moreover, in a case with facts similar to this appeal, the Court held that a link and reference to an allegedly defamatory article did not amount to a republication of the article. In *Salyer v. Southern Poverty Law Center, Inc.*, 701 F. Supp. 2d 912 (W.D. Ky. 2009) (Heyburn II, J.), the defendant posted an allegedly defamatory article to his website. Between the time of the initial posting and the defendant's removal of the article from the website, the defendant linked to the article while referencing it several times in other articles posted on the website. None of the references mentioned the plaintiff by name or restated the allegedly defamatory comments. The Court analyzed the link and reference separately, holding that neither amounted to republication. As to the link, it cautioned that "to find that a new link to an unchanged article posted long ago on a website republishes that article would result in a continual retriggering of the limitations period," and thus held that a link "is simply a new means for accessing the referenced article," not a republication. *Id.* at 916–18. As to the reference, it noted that "[w]hile [a reference] may call the *existence* of the article to the attention of a new audience, it does not present the *defamatory contents* of the article to the audience. Therefore, a reference, without more, is not properly a republication." *Id.* at 916 (emphases in original).

25

We agree with the distinction in these cases. The single publication rule advances the statute of limitations' policy of ensuring that defamation suits are brought within a specific time after the initial publication. Websites are constantly linked and updated. If each link or technical change were an act of republication, the statute of limitations would be retriggered endlessly and its effectiveness essentially eliminated. A publisher would remain subject to suit for statements made many years prior, and ultimately could be sued repeatedly for a single tortious act the prohibition of which was the genesis of the single publication rule. *See Graham*, 468 A.2d at 458. Additionally, under traditional principles of republication, a mere reference to an article, regardless how favorable it is as long as it does not restate the defamatory material, does not republish the material. *See Salyer*, 701 F. Supp. 2d at 916. These traditional principles are as applicable to Internet publication as traditional publication, if not more so. Publishing a favorable reference with a link on the Internet is significantly easier. Taken together, though a link and reference may bring readers' attention to the existence of an article, they do not republish the article.

Though the Kinney Article's link may allow for easy access to the Charter Page, and the reference may speak favorably of the items collected by the Charter Page, including the Articles regarding the CSMI Parties, here they do not amount to the restatement or alteration of the allegedly defamatory material in the Articles necessary for a republication. The Bankruptcy and District Courts were correct in sustaining the Debtors' objection to the administrative expense requests on the basis that the CSMI Parties cannot advance a sustainable cause of action to support the requests. Though the publication of the Kinney Article occurred during the post-petition operation of the Debtors' newspaper, the claim is so speculative that we

can discern no benefit conferred on the Debtors' estates even under *Reading*'s view of what is a "necessary" expense.

\* \* \* \* \*

For the reasons stated above, we affirm the District Court's judgment, but hold that the appeal is not equitably moot.