NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 16-3745, 16-3746 & 17-1513
_____

In re: ALLIED NEVADA GOLD CORP., et al., Debtors


BRIAN TUTTLE,
                              Appellant
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Nos. 1-15-cv-00946, 1-15-cv-00949, and 1-16-cv-00058)
District Judge:  Hon. Sue L. Robinson
_____

Submitted Under Third Circuit LAR 34.1(a)
March 12, 2018

Before:  JORDAN, KRAUSE, and GREENBERG, *Circuit Judges*

(Filed: March 27, 2018)
_____

OPINION*
_____

_____

   * This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

JORDAN, *Circuit Judge*.

Brian Tuttle, Jordan Darga, and Stoyan Tachev (collectively, the "Appellants"),[1] former stockholders of Allied Nevada Gold Corporation (together with its affiliated co-debtors and Appellees, "Allied Nevada"), challenge the District Court's conclusion that their bankruptcy appeals are equitably moot. We will affirm.

## I. BACKGROUND[2]

### A. Allied Nevada's Bankruptcy

The Appellants hold now-cancelled stock in Appellee Allied Nevada, which, before it declared bankruptcy, was a publicly traded company producing gold and silver. On March 10, 2015 (the "Petition Date"), Allied Nevada filed a voluntary petition for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware. As of the Petition Date, it had approximately $340 million of secured debt, and another $350 million of unsecured debt. According to an analysis by its financial advisor, Moelis & Company LLC, Allied Nevada's estimated value as a going concern following reorganization was projected to be between $200 and $300 million. Moelis's

---

[1] One of the consolidated appeals to the District Court from the Bankruptcy Court was captioned *Ad Hoc Committee of Shareholders v. Allied Nevada Gold Corp., et al.*, No. 15-946-SLR, and it did not individually name the Appellants as parties. Because their ad hoc committee was never officially recognized, *see infra* n.6 and accompanying text, we treat that appeal, and the one before us, as having been filed by the three Appellants individually.

[2] The facts are recounted in detail in the District Court's September 15, 2016, and February 10, 2017, opinions dismissing Appellants' bankruptcy appeals. Because we write primarily for the parties, we recite only the facts pertinent to this consolidated appeal. Except where indicated, those facts are undisputed.

2

valuation left stockholders out of the money by a large margin. Thus, if liquidated, Allied Nevada's equity holders, as residual claimants, stood to recover nothing.

Prior to filing for bankruptcy, Allied Nevada had negotiated a restructuring and support agreement with certain lenders representing 100% of its funded secured debt and approximately 67% of its unsecured debt. During the bankruptcy, it failed to meet some of the covenants and milestones in that agreement, but it was able to successfully renegotiate an amended agreement.

Additional stakeholders participated in the bankruptcy proceedings, including two statutory committees appointed under 11 U.S.C. § 1102, one to represent Allied Nevada's unsecured creditors (the "Creditors Committee") and the other to represent its equity holders (the "Equity Committee"). Those committees took discovery, conducted independent valuation analyses, investigated potential claims, and negotiated with Allied Nevada and other stakeholders to reach a consensual reorganization plan. Also participating, through separate counsel, was a committee of noteholders, which included certain hedge funds that ultimately agreed to fund an Exit Facility for Allied Nevada.[3]

In mid-August of 2015, Allied Nevada announced an agreement in principle (the "Global Settlement") with its major stakeholders, including the Creditors Committee and

---

[3] "Exit Facility Commitment," as defined in the reorganization plan, "means the several … commitments from the Exit Facility Lenders … to purchase the New Second Lien Convertible Notes" up to $80 million. (JA at 164.) The "Exit Facility Lenders" included Aristeia Capital LLC, Highbridge Capital Management, LLC, Mudrick Capital Management, LP, USAA Asset Management, Whitebox Advisors LLC and Wolverine Asset Management LP, and their respective affiliates. (JA at 164.) With the Bankruptcy Court's approval, the Exit Facility Lenders, among others, also provided Allied Nevada with a $78 million debtor-in-possession credit facility to help it meet its financial obligations during the bankruptcy proceedings.

the Equity Committee.  On August 27, 2015, Allied Nevada filed a final proposed reorganization plan and disclosure statement, which reflected the Global Settlement. That plan proposed the following recovery:  (1) secured creditors would receive a distribution of new secured debt in Allied Nevada; (2) unsecured creditors would receive options, with the right to receive a cash distribution or new common stock in Allied Nevada; and (3) equity security holders would receive new warrants that would allow them to purchase, as a class, up to 17.5% of Allied Nevada's outstanding new common stock.

Meanwhile, a few days prior to the Global Settlement, Tuttle, proceeding pro se, filed a motion to appoint an independent examiner to investigate potential claims against Allied Nevada.  He also sought discovery.  Allied Nevada, the Creditors Committee, and the committee of noteholders all objected to Tuttle's motion for appointment of an examiner.

The Equity Committee also submitted a response, stating that it had considered the allegations in Tuttle's motion but found no colorable claims giving rise to the equitable disallowance for any creditor's claim.  The Committee thus advised individual stockholders, including Tuttle, that they should consult an attorney to advise them on claims allegedly owned only by those stockholders, as individuals.  It also represented that it had "weighed [Moelis's] valuation analysis, operational analysis, and analysis of certain potential claims in negotiating the terms of the settlement that is embodied in the Consensual Plan of reorganization" before the Court, and concluded that the proposed settlement "provide[d] existing equity holders with the best opportunity for a recovery

4

given [Allied Nevada's] current circumstances." (JA at 364.) The Bankruptcy Court held a hearing on Tuttle's motion and denied it.

The Bankruptcy Court ultimately approved Allied Nevada's disclosure statement, and a confirmation hearing was set for October 6, 2015.[4] The Court also granted Tuttle access to the discovery materials that had been made available to the Creditors Committee and the Equity Committee, on condition that he sign the same confidentiality agreement executed by the representatives of those committees. Tuttle did not return an executed confidentiality agreement until five days prior to the confirmation hearing.

Tuttle objected to Allied Nevada's proposed reorganization plan, arguing that it undervalued Allied Nevada and that equity holders were entitled to a greater recovery. Tachev filed a brief in support of Tuttle's objection. Darga also filed an objection. Importantly, none of the Appellants filed a motion to stay.

During the October 6, 2015, confirmation hearing, Allied Nevada presented its proposed reorganization plan. Tuttle and Darga participated in the hearing, and the Bankruptcy Court permitted them to cross-examine witnesses and argue their objections. They took issue with various aspects of Allied Nevada's financial statements and Moelis's valuation analysis, and also raised allegations of fraud and mismanagement; but

---

[4] Tuttle, holding himself to be the chairman of an ad hoc committee of equity security holders, had filed an objection to Allied Nevada's notice of hearing on its proposed disclosure statement. *See supra* n.1, and *infra* n.6. At a hearing on the disclosure statement, Tuttle argued that Allied Nevada had not negotiated with an ad hoc committee, and that the stockholders' proposed recovery under the plan was inadequate. The Court overruled the objection but informed Tuttle of his right to object to the substance of the plan at confirmation.

neither proposed an alternative enterprise valuation analysis or proffered any new evidence or witnesses to substantiate their objections. During argument, Tuttle asked the Court to stay the confirmation hearing, which the Court denied as an untimely motion.

In an order dated October 8, 2015, the Bankruptcy Court confirmed the reorganization plan over the Appellants' objections. It found "no evidence that the plan itself was not proposed in good faith"; instead, it found that the plan was the product of "negotiation[s] among numerous parties, all of whom had different interest[s]," including Allied Nevada itself, the secured lenders, the Creditors Committee, and the Equity Committee "as a fiduciary representative for all shareholders." (JA at 635.) The Court accepted Moelis's valuation analysis, which it found to be "reasonable, persuasive, credible and accurate" and "not … controverted by other persuasive evidence[.]" (JA at 699-700.) Finally, although a majority of Allied Nevada's stockholders had voted to reject the plan, the Equity Committee's conclusion favoring the plan remained. The Court concluded that the reorganization plan was fair to the stockholders – the most junior class receiving a recovery – and that it provided more than they would have received in a liquidation. Two weeks later, the plan was consummated and Allied Nevada emerged from Chapter 11 as a privately-held company.

A few months later, the Bankruptcy Court held a hearing to address outstanding motions. Tuttle and Darga both participated and argued various motions related to requests for standing to prosecute and to appoint an independent examiner, additional discovery motions, expense reimbursement, and a written motion to stay, filed the day

6

before the plan's effective date.[5]  In a January 22, 2016, omnibus order (the "Omnibus Order"), the Court denied those motions.

## B.      The Consolidated Appeals

The Appellants filed multiple appeals, which were consolidated into two cases before the United States District Court for the District of Delaware.  In the first, Tuttle sought, among other things, reversal of the Bankruptcy Court's Omnibus Order.  In the second, the Appellants, as a self-styled ad hoc committee of equity security holders,[6] and Tuttle individually appealed various Bankruptcy Court orders, including the August 28, 2015, disclosure order, the October 8, 2015, confirmation order, an order denying Tuttle's first motion to appoint an examiner, and an order approving Allied Nevada's sale of certain non-core assets during bankruptcy.

In two separate opinions, issued on September 15, 2016, and February 10, 2017, the District Court dismissed the Appellants' claims as equitably moot.  In each, it rejected their argument that equitable mootness is unconstitutional.[7]  It then applied our equitable mootness test, and concluded that each factor weighed in favor of dismissal.

---

[5] Those motions are more fully described in the District Court's opinions.

[6] At the hearing and in its Omnibus Order, the Bankruptcy Court denied Tuttle's request for recognition of the ad hoc committee of equity security holders as an official committee.

[7] The District Court's reasoning for the equitable mootness dismissal is substantially the same in both opinions.  For purposes of this appeal, references to the dismissal are to both opinions, unless otherwise indicated.

Appellants challenge those dismissal orders, which have been consolidated in the appeal before us now.[8]

## II.  DISCUSSION[9]

The Appellants devote much of their briefing to the argument that equitable mootness is unconstitutional.  But as the District Court succinctly stated, equitable mootness is a valid doctrine in this Circuit:

> The constitutionality of the equitable mootness doctrine was raised in *In re One2One* [*Communications*]*, LLC*, 805 F.3d 428 (3d Cir. 2015).  As stated by the Third Circuit, "[b]ecause we have already approved the doctrine of equitable mootness in [*In re Continental Airlines*, 91 F.3d 553 (3d Cir. 1996) (en banc)], only the court sitting en banc would have the authority to reevaluate our prior holding.  This court may only decline to follow a prior decision of our court without the necessity of an en banc decision when the prior decision conflicts with a Supreme Court decision." [*One2One Commc'ns*, 805 F.3d at 432-33 (citations omitted).]

(JA at 20 n.10); *see also In re Tribune Media Co.*, 799 F.3d 272, 277-80 (3d Cir. 2015) (discussing equitable mootness).  *Continental* controls here and will continue to control unless and until we reconsider it en banc, *see One2One Commc'ns*, 805 F.3d at 438 (Krause, J., concurring), or the Supreme Court takes up the issue, which it has declined to do despite recent entreaties, *see, e.g.*, *Quinn v. City of Detroit*, 137 S. Ct. 2270 (2017); *Aurelius Capital Mgmt., L.P. v. Tribune Media Co.*, 136 S. Ct. 1459 (2016).

---

[8] In the consolidation order (Order, Apr. 19, 2017), Tuttle was granted leave to file separate briefing in Case No. 17-1513 "raising only those issues which have not been addressed in the brief previously filed" in the other appeals, Case Nos. 16-3745 and 16-3746.  Tuttle now has retained counsel who have filed briefing on his behalf.

[9] The District Court had jurisdiction to hear the appeals from the Bankruptcy Court under 28 U.S.C. § 158(a).  We have appellate jurisdiction pursuant to 28 U.S.C. §§ 158(d) and 1291.

The Appellants argue that, even if the concept of equitable mootness is legally sound, the District Court abused its discretion by applying it to dismiss their claims. We review an application of equitable mootness for abuse of discretion, *In re SemCrude, L.P.*, 728 F.3d 314, 320 (3d Cir. 2013), accepting the "findings of fact unless they are completely devoid of a credible evidentiary basis or bear no rational relationship to the supporting data." *Nordhoff Invs., Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 182 (3d Cir. 2001).

As an initial matter, we have said that "'[e]quitable mootness' is a narrow doctrine by which an appellate court deems it prudent for practical reasons to forbear deciding an appeal when to grant the relief requested will undermine the finality and reliability of consummated plans of reorganization." *Tribune*, 799 F.3d at 277. Allied Nevada, as the proponent of an equitable mootness dismissal, "bears the burden of overcoming the strong presumption that appeals from confirmation orders of reorganization plans—even those not only approved by confirmation but implemented thereafter (called 'substantial consummation' or simply 'consummation')—need to be decided." *Id.* at 278 (citation omitted).

Our recent decisions have synthesized the test for equitable mootness as "proceed[ing] in two analytical steps: (1) whether a confirmed plan has been substantially consummated; and (2) if so, whether granting the relief requested in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who

9

have justifiably relied on plan confirmation."[10] *Tribune*, 799 F.3d at 278 (quoting

*SemCrude*, 728 F.3d at 321).

As to the first step, the Appellants do not meaningfully dispute the District Court's

conclusion that Allied Nevada's reorganization plan has been substantially consummated.

The Bankruptcy Code defines "substantial consummation" to mean:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred;
>
> (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
>
> (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2).

After reviewing the record before it, which included an affidavit by Allied

Nevada's chief financial officer, the Court concluded that Allied Nevada had transferred

substantially all of its property by satisfying certain debt obligations, eliminating all then-

existing liens, and dissolving certain business entities; it had emerged from Chapter 11

bankruptcy and had been legally reorganized; and it had commenced distributions under

the plan. The District Court then listed numerous transactions and events triggered by the

plan, including that Allied Nevada had entered into new contractual agreements with its

investors and creditors, had incurred $126.7 million of new first lien term loans (some of

---

[10] To the extent Tuttle suggests that the District Court erred because it applied *Continental*'s factors instead of the test laid out in our more recent equitable mootness decisions, we think that concern is unwarranted. Although its opinion addresses the factors in the order listed in *Continental*, the District Court effectively set forth the equitable mootness test as provided in our recent opinions. And, as we explain herein, it fairly considered additional factors set forth in *Continental*.

which it has already repaid), had issued $95 million of new second lien convertible notes, had issued new warrants, and had distributed new common stock to entitled holders of general unsecured claims. The Court also credited Allied Nevada's representation that it had approved the sale of some common stock to a third party, and that it had distributed approximately $1.8 million in cash to satisfy allowed claims and to make payments on certain outstanding contracts and leases.

The Appellants' sole argument in rebuttal is that Allied Nevada's reorganization plan has not been substantially consummated because it has not completed a strategic transaction it had hoped to finance following reorganization. That alone, however, fails to negate the cascade of transactions and distributions that have followed since the plan's consummation.

Moreover, and of high significance, the Appellants did not timely seek or obtain a stay. In *Continental*, we noted that "[a] stay not sought, and a stay sought and denied, lead equally to the implementation of the plan of reorganization." 91 F.3d at 562 (citation omitted); *see also Nordhoff*, 258 F.3d at 186-87 (noting that appellants are required to "pursue with diligence all available remedies to obtain a stay" where failure to do so would render it inequitable to reverse the challenged Bankruptcy Court order (citation omitted)). That factor remains an important consideration. *See Tribune*, 799 F.3d at 282 (listing, as a second and related reason supporting an equitable mootness dismissal, that the appellants failed to obtain a stay of the confirmation order pending appeal); *One2One Commc'ns*, 805 F.3d at 452 (Krause, J., concurring) (highlighting the importance of this factor and observing that "every time we have affirmed a finding of

11

equitable mootness after *Continental*…, the appellant failed to file a motion for a stay.").
On this record, we discern no error in the District Court's conclusion that the plan was substantially consummated.

As to the second step, the Court considered whether granting the Appellants' requested relief would "require undoing the plan as opposed to modify[ing] it in a manner that does not cause its collapse." (JA at 22 (citing *One2One Commc'ns*, 805 F.3d at 435).) Tuttle argues that, instead of applying equitable mootness and dismissing his claims, the District Court should have exercised its remedial powers and fashioned relief in a way that would not upset the plan.

Although we have said that courts "may fashion whatever relief is practicable instead of declining review simply because full relief is not available[,]" we have also said that the "starting point is the relief an appellant specifically asks for." *Tribune*, 799 F.3d at 278 (citation omitted). Indeed, we have affirmed dismissal on equitable mootness grounds because appellants "propose[d] no relief that would not involve reopening [claims settled by the reorganization plan,]" reasoning that "[a]llowing those suits would knock the props out from under the authorization for every transaction that ha[d] taken place." *Id.* at 281 (internal quotation marks and citation omitted).

Here, the Appellants asked the District Court to vacate the confirmation order, unwind completed transactions, and revalue Allied Nevada so as to increase the distribution to stockholders. In other words, they sought to do the whole thing over, which is not much of an alternative in the face of a substantially consummated plan. The Court reasonably rejected that. It concluded that Allied Nevada had shown "a

12

sufficiently complex reorganization" based on "compromises and agreements that took place over many months" among competing stakeholders, culminating in the Global Settlement and a release of claims embodied in the final plan, which "would be difficult to unravel[.]" (JA at 24.) It did not abuse its discretion by not *sua sponte* fashioning alternative relief. Rather, it reasonably concluded that to grant the Appellants' requested relief would be inequitable.

The Appellants also contest the District Court's conclusion that the requested relief would harm third parties not before the Court. They argue that granting relief would actually benefit certain third parties, including other holders of cancelled stock who held impaired claims. Tuttle adds that the Court erred by extending equitable mootness to protect the interests of sophisticated entities, like Allied Nevada's Exit Facility Lenders. He believes that the reorganization plan "was not adopted in good faith, but was instead designed to unfairly favor" those lenders, and he characterizes his efforts as seeking to recover a "shortfall" that left Allied Nevada's stockholders with only warrants. (Tuttle's Reply at 18.) None of that speaks to the question of whether, in undoing the plan, substantial harm would be done to third parties, including Allied Nevada's creditors and other debtholders, and more generally, stakeholders who held superior claims.

The short of it is that there was no error in the District Court's conclusion, at step one, that the reorganization plan has been substantially consummated, and no abuse of discretion at step two in deciding that granting relief "would likely topple the delicate balances and compromises struck by the [p]lan." (JA at 25 (internal quotation marks and

13

citation omitted).)  Although it should be cautiously applied, the equitable mootness

doctrine sometimes is warranted to prevent a court from unscrambling "complex

bankruptcy reorganizations when the appealing party should have acted before the plan

became extremely difficult to retract."  *In re Phila. Newspapers LLC*, 690 F.3d 161, 169

(3d Cir. 2012) (quoting *Nordhoff*, 258 F.3d at 185).  That is the case here.[11]

## III.    CONCLUSION

For the foregoing reasons, we will affirm the District Court's orders dismissing the

Appellants' claims as equitably moot.

---

[11] In light of our holding, we need not address the District Court's alternative conclusion that, even if equitable mootness did not apply, Tuttle failed to show that the Bankruptcy Court "abuse[d] its discretion or err[ed] in denying Tuttle's motions for reconsideration and [the] other motions that are the subject of [his] appeal."  (JA at 20 n.11.)