PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2736
_____

In re:  SEMCRUDE, L.P., et al.,
                               Reorganized Debtors


SAMSON ENERGY RESOURCES COMPANY, et al.

v.

SEMCRUDE, L.P., et al.

Luke Oil Company,
C & S Oil/Cross Properties, Inc.,
Wayne Thomas Oil and Gas and
William R. Earnhardt, Co.,
                               Appellants


_____

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 1-09-cv-00994)
District Judge: Honorable Leonard P. Stark
_____

Argued February 19, 2013

Before:  AMBRO, FISHER, and JORDAN, <u>Circuit Judges</u>

(Opinion filed: August 27, 2013)

Hartley B. Martyn, Esquire
Martyn & Associates
820 Superior Avenue, N.W., 10th Floor
Cleveland, OH   44113

Duane D. Werb, Esquire     (**Argued**)
Werb & Sullivan
300 Delaware Avenue, 13th Floor
P.O. Box 25046
Wilmington, DE   19899

    *Counsel for Appellants*

Yolanda C. Garcia, Esquire
Martin A. Sosland, Esquire (**Argued**)
Vance L. Beagles, Esquire
Weil, Gotshal & Manges
200 Crescent Court, Suite 300
Dallas, TX   75201

L. Katherine Good, Esquire
John H. Knight, Esquire
Richards, Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE   19801

    *Counsel for Appellees*

## OPINION OF THE COURT

AMBRO, Circuit Judge

We revisit equitable mootness, a judge-made abstention doctrine that allows a court to avoid hearing the merits of a bankruptcy appeal because implementing the requested relief would cause havoc.[1] As many courts have noted, though its name suggests mootness in the constitutional sense, that is where the similarity between the doctrines ends. *See, e.g.*, *In re UNR Industries, Inc.*, 20 F.3d 766, 769 (7th Cir. 1994). Mootness is a threshold issue that prevents a federal court from hearing a case where there is no live case or controversy as required by Article III of our Constitution. *Honig v. Doe*, 484 U.S. 305, 317 (1988). Equitable mootness, in contrast, does not ask whether a court can hear a case, but whether it should refrain from doing so because of the perceived disruption and harm that granting relief would cause.[2] *Official Comm. of Unsecured Creditors*

---

[1] Bankruptcy courts have also invoked the doctrine outside the appellate context, for example, in dismissing a complaint seeking revocation of plan confirmation under 11 U.S.C. § 1144. *See In re Innovative Clinical Solutions, Ltd.*, 302 B.R. 136, 140–41 (Bankr. D. Del. 2003). We take no position on whether use of the doctrine there is appropriate.

[2] The danger of courts conflating the doctrines has led Judge Easterbrook to "banish 'equitable mootness' from the (local) lexicon" in the Seventh Circuit. *UNR*, 20 F.3d at 769.

*of LTV Aerospace and Defense Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.)*, 988 F.2d 322, 325 (2d Cir. 1993).

Equitable mootness comes into play in bankruptcy (so far as we know, its only playground) after a plan of reorganization is approved. Once effective, reorganizations typically implement complex transactions requiring significant financial investment. Following confirmation of a plan by a bankruptcy court, an aggrieved party has the statutory right to appeal the court's rulings. Nonetheless, if debtors or others believe granting the requested relief would disrupt the effected plan or harm third parties, they may seek to dismiss the appeal as equitably moot. Their contention is that even if the implemented plan is imperfect, granting the relief requested would cause more harm than good.

Courts have rarely analyzed the source of their authority to refuse to hear an appeal on equitable mootness grounds.[3] The most plausible basis is found in federal common law. *See UNR*, 20 F.3d at 769. The Bankruptcy Code forbids appellate review of certain un-stayed orders, *see*

---

Though we do not ban the term (it is encrusted enough that we suffer its continued usage), "prudential forbearance" more accurately reflects the decision to decline hearing the merits of an appeal because of its feared consequences.

[3] When we adopted equitable mootness, we did not, as then-Judge Alito noted in dissent, "undertake an independent analysis of the origin or scope of the doctrine but [were] instead content to rely on the decisions of other courts of appeals." *In re Continental Airlines*, 91 F.3d 553, 568 (3d Cir. 1996) (*en banc*) (Alito, J., dissenting).

11 U.S.C. §§ 363(m), 364(e), and restricts post-confirmation plan modifications, *see id.* § 1127. Though these provisions arguably express a policy favoring the finality of bankruptcy decisions, the Code does not expressly limit appellate review of plan confirmation orders. *In re Pac. Lumber Co.*, 584 F.3d 229, 240 (5th Cir. 2009); *UNR*, 20 F.3d at 769. Courts have filled this gap by declining to hear appeals where they perceive that the interests of finality outweigh those of the appealing party.

Because we have already approved the doctrine (though narrowly in a 7-6 *en banc* ruling), *In re Continental Airlines*, 91 F.3d 553, 568 (3d Cir. 1996) (*en banc*) ("*Continental I*"), we need not detour ourselves to consider whether federal common law can support its use. Its judge-made origin, coupled with the responsibility of federal courts to exercise their jurisdictional mandate, obliges us, however, to proceed most carefully before dismissing an appeal as equitably moot.

Turning to the specifics of this appeal, Appellants are four Oklahoma producers (collectively, the "Appellants")[4] that supplied oil and gas to SemCrude, L.P. and related entities (collectively, the "Debtors" or, following reorganization, the "Reorganized Debtors") on credit. Shortly after Debtors petitioned for bankruptcy, Appellants filed a complaint contending that they retained property and statutory lien rights in those commodities. On multiple occasions, Appellants asserted—either in objecting to the Bankruptcy Court's rulings or in seeking interlocutory

---

[4] They are Luke Oil Company, C&S Oil/Cross Properties Inc., Wayne Thomas Oil and Gas, and William Earnhardt Co. Debtors are affiliated companies whose bankruptcies are jointly administered.

5

appellate review—that their claims against Debtors could not be discharged without affording them the opportunity to litigate their claims in an adversary proceeding. Yet they have never been given that opportunity.

Following confirmation of Debtors' reorganization plan, which constitutes a final judgment in bankruptcy cases, *In re PWS Holding Corp.*, 228 F.3d 224, 235 (3d Cir. 2000), Appellants appealed to the District Court. Again they were turned away, this time because their appeal was deemed equitably moot.

They now appeal to us. Because we agree that the evidentiary record does not support dismissal of that appeal for equitable mootness, we reverse the District Court's order and remand for it to hear the merits of Appellants' appeal.

## I.    Background

Debtors were (and continue to be following reorganization) a midstream oil and gas business engaged in the gathering, transportation, storage, and marketing of crude oil and other petroleum products. In July 2008, they filed voluntary petitions under Chapter 11 of the Bankruptcy Code. Numerous producers (the "Producers"), like Appellants, had supplied oil and gas to Debtors on credit prior to their filing for bankruptcy. In the Bankruptcy Court, these Producers asserted a variety of claims against Debtors entitling them to receive distributions from the proceeds of the oil and gas ahead of other creditors. Debtors and Appellants disagreed about the appropriate mechanism for resolving these claims.

Debtors filed a motion to establish global procedures. They entitled the Producers to file one representative proceeding for each state in which they supplied oil and gas to Debtors. All interested parties had the right to brief, and

6

present oral argument on, their claims. Regardless whether a Producer participated, however, the legal rulings from the representative action would be binding on it.

Appellants objected to these procedures. They argued that the Federal Rules of Bankruptcy Procedure entitled them to an adversary proceeding on their claims. About the same time, they filed a complaint asserting their individual claims against Debtors and seeking class certification to assert those of similarly situated Producers in Oklahoma.

The Bankruptcy Court granted Debtors' motion to implement their proposed resolution procedures and stayed Appellants' adversary proceeding. After filing an unsuccessful motion for reconsideration with the Bankruptcy Court, Appellants sought leave from the District Court to file an interlocutory appeal challenging the procedures. That Court—noting that "the question of whether [Appellants] will, in fact, be bound by the[] outcome [of the representative proceedings] can be litigated at a later date"—declined to hear the appeal. *In re SemCrude, L.P.*, 407 B.R. 553, 557 (D. Del. 2009).

Several representative proceedings—asserting rights under Oklahoma, Texas, Kansas, New Mexico, and Wyoming law—were subsequently filed. Other Producers based in Oklahoma (but not Appellants) filed a representative proceeding asserting that they retained property interests and statutory liens in the oil and gas they supplied to Debtors. The Bankruptcy Court granted summary judgment against the Oklahoma-based Producers. *In re SemCrude, L.P.*, 407 B.R. 140 (Bankr. D. Del. 2009). It similarly rejected the claims of Producers from Kansas and Texas. *In re SemCrude, L.P.*, 407 B.R. 82 (Bankr. D. Del. 2009) (Kansas); *In re SemCrude, L.P.*, 407 B.R. 112 (Bankr. D. Del. 2009) (Texas). Recognizing the novelty of these issues, however, the Court

7

*sua sponte* certified direct appeals to our Court under 28 U.S.C. § 158(d)(2).

Before we heard these appeals (or the Bankruptcy Court issued rulings in the other representative proceedings), Debtors, their senior secured lenders, and an Official Producers Committee reached a settlement that purported to resolve the claims of all the Producers (the "Producer Settlement").[5]   Debtors subsequently filed a reorganization plan incorporating the terms of the Producer Settlement. Among other things, the settlement provided over $160 million in distributions to the Producers in exchange for the discharge of their claims.   It also required the voluntary dismissal of all adversary proceedings and other litigation related to the Producers' claims.

Appellants were not involved in negotiating the Producer Settlement and did not expressly agree to its terms. Through its incorporation into the reorganization plan, the settlement nonetheless set the cash distributions they would receive, though they were able to obtain a waiver of the requirement that they dismiss their adversary proceeding.

The plan placed Appellants, along with other claimants, into classes of similarly situated creditors, and gave them the opportunity to vote on and object to the reorganization plan.   The requisite majority of claimants in each of these classes voted to accept the plan.   Two of the Appellants voted for it, and two abstained from voting.   All four of the Appellants, however, filed objections to the plan asserting that they should be permitted to proceed with their adversary proceeding.   Following a hearing, the Bankruptcy

---

[5] The Official Producers Committee was formed pursuant to 11 U.S.C. § 1102(a)(2).   Its members were appointed by the United States trustee. *Id.*

8

Court overruled their objections, approved the plan, and entered a confirmation order in October 2009.

Appellants appealed to the District Court. They again asserted that the reorganization plan could not validly discharge their claims without affording them the procedural protections of an adversary proceeding, and requested that they be permitted to proceed in the Bankruptcy Court. They did not seek a stay pending appeal.

Partly as a consequence of their failure to obtain a stay, the plan went into effect. On November 30, 2009 (the plan's effective date), several corporate restructuring transactions, the repayment of certain payment obligations, and the issuance of securities to those parties receiving equity distributions, were implemented.

Debtors sought to dismiss the appeal as equitably moot. Among other things, they argued that granting Appellants' requested relief would require unraveling the reorganization plan and harm numerous third parties. To avoid these feared outcomes, the District Court dismissed the appeal. *In re SemCrude, L.P.*, No. 09 Civ. 994, 2012 WL 1836353 (D. Del. May 21, 2012). Appellants appeal, and ask us to vacate that order and remand with instructions to hear the merits of their appeal.

## II.     Jurisdiction and Standard of Review

The District Court had jurisdiction of this appeal under 28 U.S.C. §§ 158(a) and 1334. We have jurisdiction under 28 U.S.C. §§ 158(d) and 1291. We review the Court's equitable

9

mootness determination for abuse of discretion.[6]  *Continental I*, 91 F.3d at 560.

### III.    The Equitable Mootness Doctrine

Following confirmation of a reorganization plan by a bankruptcy court, an aggrieved party has the statutory right to appeal the court's rulings.  Once there is an appeal, there is a "virtually unflagging obligation" of federal courts to exercise the jurisdiction conferred on them.  *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).  Before there is a basis to forgo jurisdiction, granting relief on appeal must be almost certain to produce a "perverse" outcome—"chaos in the bankruptcy court" from a plan in tatters and/or significant "injury to third parties."  *In re Phila. Newspapers, LLC*, 690 F.3d 161, 168 (3d Cir. 2012) (citing *Nordhoff Invs., Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 184 (3d Cir. 2001); *Continental I*, 91 F.3d at 560–61).  Only then is equitable mootness a valid consideration.

In determining whether an appellate court should dismiss an appeal on this ground, we assess five prudential factors:

> (1) whether the reorganization plan has been substantially

---

[6] As we recently noted, "[t]hen Circuit Judge Alito criticized this standard of review as contradicting our precedent that where the district court sits as an appellate court, we exercise plenary review."  *In re Phila. Newspapers, LLC*, 690 F.3d 161, 167–68 n.10 (3d Cir. 2012) (citing *Continental I*, 91 F.3d at 568 n.4).  We are inclined to agree with this criticism, but nonetheless are bound to review for abuse of discretion.

consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments.

*Continental I*, 91 F.3d at 560.

These factors, as we explained recently, are interconnected and overlapping. *Phila. Newspapers*, 690 F.3d at 168–69. "The second factor principally duplicates the first in the sense that a plan cannot be substantially consummated if the appellant has successfully sought a stay." *Id.* at 169 (quotation marks and citation omitted). In analyzing the first factor, courts have asked "whether allowing an appeal to go forward will undermine the plan, and not merely whether the plan has been substantially consummated under the Bankruptcy Code's definition." *Id.* at 168-69 (citations omitted). This collapses the first and fourth factors. The third factor adds an additional consideration—whether granting relief will undermine "the reliance of third parties, in particular investors, on the finality of [plan confirmation]." *Id.* at 169 (quotation marks and citation omitted). "Finally, the fifth factor supports the other four by encouraging investors and others to rely on confirmation orders, thereby facilitating successful reorganizations by fostering confidence in the finality of confirmed plans." *Id.* at 169.

In practice, it is useful to think of equitable mootness as proceeding in two analytical steps: (1) whether a confirmed plan has been substantially consummated; and (2) if so,

11

whether granting the relief requested in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have justifiably relied on plan confirmation.

Substantial consummation is defined in the Bankruptcy Code to mean the

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred;
>
> (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
>
> (C) commencement of distribution under the plan.

11 U.S.C. § 1101. Satisfaction of this statutory standard indicates that implementation of the plan has progressed to the point that turning back may be imprudent.

If this threshold is satisfied, a court should continue to the next step in the analysis. It should look to whether granting relief will require undoing the plan as opposed to modifying it in a manner that does not cause its collapse. *See In re Zenith Elecs. Corp.*, 329 F.3d 338, 343–44 (3d Cir. 2003) (appeal not equitably moot where disgorgement of professional fees would not unravel plan); *United Artists Theatre Co. v. Walton*, 315 F.3d 217, 228 (3d Cir. 2003) (appeal not equitably moot where striking indemnification provision would allow the plan to stay otherwise intact); *PWS*, 228 F.3d at 236 (appeal not equitably moot where plan

could go forward even if certain releases were struck from it). It should also consider the extent that a successful appeal, by altering the plan or otherwise, will harm third parties who have acted reasonably in reliance on the finality of plan confirmation. *See In re Continental Airlines*, 203 F.3d 203, 210 (3d Cir. 2000) ("*Continental II*"); *Continental I*, 91 F.3d at 562.

We have never explicitly addressed which party bears the burden to prove that, weighing these factors, dismissal is warranted. Dismissing an appeal over which we have jurisdiction, as noted, should be the rare exception and not the rule. It should also be based on an evidentiary record, and not speculation. To encourage this, we join other Courts of Appeals in placing the burden on the party seeking dismissal. *See, e.g.*, *In re Lett*, 632 F.3d 1216, 1226 (11th Cir. 2011); *In re Paige*, 584 F.3d 1327, 1339–40 (10th Cir. 2009); *In re Focus Media, Inc.*, 378 F.3d 916, 923 (9th Cir. 2004).[7]

Though some courts have shifted the burden to the appellant when a plan has been substantially consummated,

---

[7] Despite our never directly addressing this issue, in other cases we have focused on whether the debtors/appellees provided evidence supporting an equitable mootness ruling. *Compare Continental I*, 91 F.3d at 563 (affirming a dismissal based, in part, on the testimony of the debtors' expert that the investors would have the option to withdraw if the appeal were successful), *with Continental II*, 203 F.3d at 210–11 (declining to dismiss because, in part, the debtors did not provide any evidence that third parties relied on the foreclosure of appellants' requested relief in deciding to support the plan). It is not inconsistent with these decisions to place the burden on the party seeking dismissal.

*see, e.g.*, *Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.)*, 94 F.3d 772, 776 (2d Cir.1996), we do not adopt that approach. Whether a plan has been substantially consummated often depends, as in *LTV Steel*, on whether a stay has been issued. However, neither the Bankruptcy Code nor any other statute predicates the ability to appeal a bankruptcy court's ruling on obtaining a stay.[8] As such, we are unwilling to shift the burden to the appealing party based on its failure to do something Congress has not required it to do.

## IV. Applicability of Equitable Mootness

Before applying the prudential factors to this appeal, we note a preliminary issue raised by the parties. Federal Rule of Bankruptcy Procedure 7001 provides that certain bankruptcy matters—including, according to Appellants, their claims—must be resolved through adversary proceedings. Those proceedings, which approximate civil actions, provide similar procedural protections as the Federal Rules of Civil Procedure. 10 Collier on Bankruptcy ¶ 7001.01 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. rev. 2013). The parties disagree on whether an appeal asserting a denial of these protections can be dismissed as equitably moot.

Appellants assert that the equitable mootness doctrine cannot preclude their appeal because they have a due process right to an adversary proceeding that overrides any interest in preserving the finality of confirmation orders. They rely on our decision in *In re Mansaray–Ruffin*, 530 F.3d 230 (3d Cir.

---

[8] The Bankruptcy Code does forbid appellate review of certain un-stayed orders. *See* 11 U.S.C. § 363(m) (order to sell or lease property); *id.* § 364(e) (order to obtain post-petition financing). Because of these statutory bars, however, equitable mootness is irrelevant in those instances.

14

2008), to support that argument. There, a debtor purported to invalidate a lien on her property by providing for it as an unsecured claim in her confirmed plan instead of filing an adversary proceeding. *Id.* at 243. Though confirmed plans are normally binding, 11 U.S.C. § 1327, we held that this did not preclude the creditor from seeking to enforce the lien in a subsequent action. *Id.* Where Rule 7001 "require[s] an adversary proceeding—which entails a fundamentally different, and heightened, level of procedural protections—to resolve a particular issue, a creditor has the due process right not to have that issue resolved without one." *Id.* at 242. "The mandatory nature" of this due process right "trump[s] [the] finality" of confirmed plans. *Id.* at 238. Appellants assert that their right to an adversary proceeding similarly overrides any finality interests promoted by the equitable mootness concept.

Debtors respond that the Supreme Court's decision in *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010), effectively overrules *Mansaray*. A creditor filed a motion in *Espinosa* seeking relief from a confirmation order on the ground that the debtor had attempted to discharge her student loan debt without filing an adversary proceeding as required by the Bankruptcy Rules. The Supreme Court held that this error was insufficient to vacate the Bankruptcy Court's order confirming the plan. *Id*. at 269–72. Though Federal Rule of Civil Procedure 60(b)(4), which allows a court to void a final judgment, "applies . . . where [the] judgment is premised . . . on a violation of due process," the failure to file an adversary proceeding did not deny the creditor due process. *Id.* at 271–72. To the contrary, sufficient process was afforded by providing notice of and an opportunity to object to the debtor's plan. That holding, Debtors argue, overturns our determination in *Mansaray* that the Bankruptcy Rules establish due process rights that can trump finality.

15

Though this issue is intriguing, we need not, and do not, address it in this opinion. This is so because, no matter how we would resolve the issue, equitable mootness was not a proper shield here.

## V.     Application of the Equitable Mootness Factors

With that backdrop, we turn to this appeal. Based largely on a non-precedential decision of this Court, *see In re SemCrude, L.P.*, 456 F. App'x 167 (3d Cir. 2012), the District Court found that the plan was substantially consummated. It also observed that Appellants had failed to seek or obtain a stay. We have no qualms with those determinations. However, it also found that granting relief to Appellants would undermine the reorganization plan confirmed by the Bankruptcy Court and harm third parties. Because the record does not support these latter, and crucial, findings, we hold that the Court abused its discretion in dismissing Appellants' appeal.

A.     <u>Substantial Consummation and Obtaining a Stay</u>

The parties do not dispute, and we know no reason to disagree, that the reorganization plan has been substantially consummated, due in part to Appellants' failure to obtain a stay. Distributions have been made to creditors, financial transactions were put in place, and the Reorganized Debtors have emerged from bankruptcy as a financially sound, indeed thriving, oil and gas business. Though Appellants would have been wise to seek a stay to stop the prospect of equitable mootness in its tracks, their statutory right to appeal, as noted, is not premised on their doing so. We thus turn to whether granting them relief will have the feared outcomes—collapsing the plan and significantly injuring third parties who reasonably relied on its implementation—with which equitable mootness is ultimately concerned.

16

B.      Success of the Plan

Debtors make the all-or-nothing assertion that

> [p]roviding *even a modicum of relief* to [Appellants] would upset the delicate balance of the [Producer] Settlement embodied in the Plan. . . .  The rulings of the Bankruptcy Court in the [representative proceedings] created the basis of the intense negotiations that led to the Settlement and eventually resulted in the overwhelming majority of the Producers supporting the Plan. *Affording the Appellants the relief they seek would necessitate unraveling the entire Plan.*

Debtors' Br. at 42–43 (emphases added).

These conclusions are unsupported by the evidence.  It is important to understand Appellants' requested relief.  They do not assert that the central compromise of the Producer Settlement is impermissible.  They simply seek a ruling that the plan did not discharge their claims, and ask for the opportunity to assert them in an adversary proceeding.[9]  We

_____

[9] Debtors rely on *In re U.S. Brass Corp.*, 169 F.3d 957 (5th Cir. 1999).  There, the confirmed reorganization plan incorporated a settlement between a group of creditors and the debtor that entitled the settling creditors to 80% of the debtor's insurance recoveries.  *Id.* at 958–59.  The remaining 20% of recoveries were designated for the other creditors in the class.  *Id.*  The latter creditors asserted on appeal that this

17

have no indication—other than Debtors' "Chicken Little" statements—that this would upset the Producer Settlement or that doing so would cause the remainder of the plan to collapse.

Even if Appellants are successful on their claims—far from a certain result—the amounts involved will not require a sufficient redistribution of assets to destabilize the financial basis of the settlement. Appellants have already received $210,445.83 under the current plan. They claim that they are entitled to an additional $207,300.62. This is a relatively minor amount, less than 0.15% of the over $160 million designated for distribution to the Producers. It pales even more in the context of the entire reorganization plan, which involved over $2 billion. The amount sought by Appellants is roughly one-tenth of one percent of that sum.

We also fail to see any indication that allowing Appellants to proceed with their claims would result in a deluge of other Producers filing their own adversary proceedings. Unlike with Appellants, we are unaware of any evidence in the record showing that other Producers objected to the discharge of their claims or asserted the right to an adversary proceeding. In return for distributions they received under the plan, other Producers were required to dismiss with prejudice any adversary proceedings they had filed. Absent their objecting at the time of plan confirmation

provision violated 11 U.S.C. § 1123(a)(4), which requires a confirmed plan to treat the same all creditors within a class. *Id.* at 958. The Court dismissed the appeal as equitably moot rather than reaching its merits primarily because a successful appeal would have required it to excise the entire settlement, and thus destabilize the remainder of the plan. *Id.* at 962. Those spectors are not before us.

18

to this dismissal requirement (as well as to the discharge of their claims), they cannot now attempt to restart those actions.

Debtors' best argument is that Appellants' adversary proceeding is a putative class action that theoretically could be financially significant enough to disrupt the litigation peace achieved by the settlement. The parties disagree as to the potential damages that could result from a successful class action. Debtors assert that it could require them to make payments of up to $81.7 million. Debtors' Letter at 2–3 (Mar. 8, 2013). Appellants counter that the payments would only approach around $40 million. Appellants' Letter at 2–3 (Mar. 20, 2013).

Regardless of the amount involved, the most we can say of Debtors' argument is that it asserts the finish without the steps to get there. No class has been certified. And assuming one is certified, we have little information about what it would look like. The claims of many putative class members, for example, may be precluded if they acquiesced to a representative proceeding in lieu of individual adversary proceedings, explicitly agreed to the Producer Settlement, or failed to object to the plan as impermissibly discharging their claims without an adversary proceeding. We cannot assume that allowing Appellants to seek class certification will risk unraveling the plan in the absence of more detailed information about the potential class claims. As then-Judge Alito explained, the feared consequences of a successful appeal are often more appropriately dealt with by fashioning limited relief at the remedial stage than by refusing to hear the merits of an appeal at its outset. *See Continental I*, 91 F.3d at 571–72 (Alito, J., dissenting). This is particularly true where, as here, the perceived harms are at best speculative.

C.      Injury to Third Parties

Debtors also assert that a successful appeal will harm third parties. In particular they have identified four groups they claim would be adversely affected: (1) lenders; (2) equity investors; (3) customers and suppliers; and (4) creditor constituencies. Debtors' Br. at 53–55. These groups entered into a variety of transactions and agreements in connection with the reorganization plan. Granting Appellants the relief they request, in Debtors' view, would harm these third parties by upsetting their expectation that plan confirmation was final. We address each group in turn.

We begin with the lenders, who provided exit financing for the Reorganized Debtors. According to Debtors,

> [t]he Exit Financing Participants and those other third party entities relying on the Exit Facility would be severely harmed should the Confirmation Order be reversed; if there is no longer a Confirmation Order, the new lenders under the Exit Facility would likely attempt to terminate the Exit Facility and the Reorganized Debtors would be unable to continue their business, which would likely lead to the inability of the Reorganized Debtors to repay the borrowed funds.

Debtors' Br. at 54. This argument is counterintuitive. Why would these lenders terminate the credit facility if doing so

20

would cause harm to themselves? Moreover, we have no evidence supporting the inference that they would take this action. Debtors' rely on an affidavit by Robert Fitzgerald—the Chief Financial Officer of the Reorganized Debtors' parent company, SemGroup Corporation ("SemGroup")—to support this argument. Appellants' App. at 627–28. That affidavit merely describes the credit facilities into which the Reorganized Debtors and the lenders entered. It says nothing about whether the lenders would seek to invalidate the loan agreements if Appellants are granted relief, let alone that they would have the legal right to do so.

We are also not persuaded that the equity investors will be materially harmed. As discussed, the amounts of Appellants' individual claims are relatively insignificant, and it is premature to assume that the putative class action will result in significantly greater financial exposure. Regardless of the potential amount, moreover, there is little reason to think that the Reorganized Debtors' financial well-being—and thus the prospects of their equity investors—would be threatened by granting Appellants relief. SemGroup has emerged from bankruptcy in robust financial health. According to its public securities filings, in March 2012 (shortly before the District Court dismissed Appellants' appeal as equitably moot), SemGroup had over $73 million in cash or cash equivalents, substantially more than the $50 million it was provided under the plan when it emerged from bankruptcy.[10] It also had in excess of $140 million in

---

[10] In their briefing, Debtors referred to this $50 million figure as "working capital," which is commonly calculated as total current assets less total current liabilities. Following our request for clarification, they informed us that the $50 million figure actually refers to the cash or cash equivalents that, under the reorganization plan, SemGroup was permitted to

working capital.[11]    Moreover, as the Fitzgerald affidavit attests, the Reorganized Debtors have a variety of credit sources available to fund their operations.  Appellants' App. at 628–29.  With this positive backdrop, it is not self-evident that Appellants' claims pose any significant risk, and we have not been provided any testimony or other evidence to the contrary.

Harm to the final two groups—the Reorganized Debtors' customers and suppliers and the Debtors'

have on hand immediately following confirmation. Appellants' Letter at 1 (Mar. 8, 2013).

[11] These cash (or cash equivalent) and working capital figures are drawn from SemGroup's Securities and Exchange Commission Quarterly Report for the period ended on March 31, 2012.  SemGroup Corp., Quarterly Report (Form 10-Q) (May 9, 2012).  We take judicial notice of this publicly filed report.  *See* Fed. R. Evid. 201(c)(1); Fed. R. Evid. 201 advisory committee's note ("In accord with the usual view, judicial notice may be taken at any stage of the proceedings, whether in the trial court or on appeal.").

Looking further out, SemGroup's financial future appears likely to remain stable.  According to its Securities and Exchange Commission Quarterly Report for the period ended on March 31, 2013, by that time SemGroup's cash and cash equivalents exceeded $77 million and its working capital topped $142 million.  SemGroup Corp., Quarterly Report (Form 10-Q) (May 9, 2013).  And all this, of course, says nothing of liability insurance that the Reorganized Debtors may have to offset any future losses they do incur if Appellants ultimately win their adversary proceeding.

creditors—appears lacking as well. According to Debtors, the customers and suppliers will be hurt because the Reorganized Debtors have assumed a variety of executory contracts and unexpired leases in an attempt to solidify these business relationships. However, they have not explained why granting Appellants relief would require them now to reject those agreements. Debtors contend the creditor constituencies will be harmed because granting relief would destabilize a series of settlements they have made with those constituencies. But the only settlement identified by Debtors is the Producer Settlement, and (as discussed) it does not appear that settlement will be imperiled.

D.      Policy Considerations

Preserving the finality of plan confirmation to encourage parties to move forward with plan execution justifies forbearing the exercise of jurisdiction only where precluding the appeal will prevent a perverse outcome. As the Supreme Court has instructed on numerous occasions, "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (collecting cases). The presumptive position remains that federal courts should hear and decide on the merits cases properly before them.

When equitable mootness is used as a sword rather than a shield, this presumption is upended. Appellants have repeatedly advanced the contention that they are entitled to an adversary proceeding. They filed a complaint to begin such a proceeding, objected to the rulings of the Bankruptcy Court disallowing it, and sought interlocutory appellate review in the District Court. Denying them review now—based on speculation of future harms—would be distinctly inequitable, the antithesis of the equity required for "mootness."

## V.    Conclusion

Dismissing an appeal as equitably moot should be rare, occurring only where there is sufficient justification to override the statutory appellate rights of the party seeking review.    Here, the evidentiary record does not support Debtors' contentions that a successful appeal would collapse their plan of reorganization or undermine the justifiable reliance of third parties to their significant harm.    Holding otherwise was an abuse of discretion.    We thus reverse the District Court's dismissal, and remand for it to hear Appellants' appeal on its merits.[12]

---

[12] Appellants have a long road ahead despite their procedural victory here.    On remand to the District Court, they will need to demonstrate that they are entitled to an adversary proceeding.    If they win on that issue and continue to pursue their putative class claims, they will need to obtain class certification.    And regardless whether they assert individual or class claims, they will have to litigate them successfully.    We take no position on the likelihood of Appellants achieving any of these results.