# United States Court of Appeals
## For the First Circuit

No. 19-1391

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, as Representative for the Commonwealth of Puerto Rico; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as
Representative for the Puerto Rico Highways and Transportation
Authority; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, as Representative for the Puerto Rico Electric
Power Authority (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, as Representative for the Puerto Rico
Sales Tax Financing Corporation, a/k/a Cofina; THE FINANCIAL
OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as
Representative for the Employees Retirement System of the
Government of the Commonwealth of Puerto Rico,

Debtors.

---

COOPERATIVA DE AHORRO Y CREDITO DR. MANUEL ZENO GANDIA;
COOPERATIVA DE AHORRO Y CREDITO DE JUANA DIAZ; COOPERATIVA DE
AHORRO Y CREDITO DE RINCON,

Creditors, Appellants,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as
representative for the Commonwealth of Puerto Rico; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as
representative for the Puerto Rico Sales Tax Financing
Corporation, a/k/a Cofina,

Debtors, Appellees,

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY;
ARISTEIA MASTER L.P.; ASIG INTERNATIONAL LIMITED; CANYON
BALANCED MASTER FUND, LTD.; CANYON BLUE CREDIT INVESTMENT FUND,
L.P.; CANYON DISTRESSED OPPORTUNITY INVESTING FUND II, L.P.;
CANYON DISTRESSED OPPORTUNITY MASTER FUND II, L.P.; CANYON NZ-
DOF INVESTING, L.P.; CANYON VALUE REALIZATION FUND, L.P.; CANYON

VALUE REALIZATION MAC 18 LTD.; CANYON-ASP FUND, L.P.; CANYON-GRF MASTER FUND II, L.P.; CANYON-SL VALUE FUND, L.P.; CENTURYLINK INC. DEFINED BENEFIT MASTER TRUST; COMPASS ESMA LP; COMPASS TSMA LP; CORBIN ERISA OPPORTUNITY FUND, LTD.; CORBIN OPPORTUNITY FUND, L.P.; CREDIT FUND GOLDEN LTD.; DECAGON HOLDINGS 1, LLC; DECAGON HOLDINGS 2, LLC; DECAGON HOLDINGS 3, LLC; DECAGON HOLDINGS 4, LLC; DECAGON HOLDINGS 5, LLC; DECAGON HOLDINGS 6, LLC; DECAGON HOLDINGS 7, LLC; DECAGON HOLDINGS 8, LLC; DECAGON HOLDINGS 9, LLC; DECAGON HOLDINGS 10, LLC; EP CANYON LTD., f/k/a Permal Canyon 10 Ltd.; GN3 SIP LIMITED; GOLDENTREE ENTRUST MASTER SPC, on behalf of and for the account of Segregated Portfolio I; GOLDENTREE NJ DISTRESSED FUND 2015 LP; GOLD COAST CAPITAL SUBSIDIARY X LIMITED; GOLDENTREE 2017K-SC, LTD.; GOLDENTREE DISTRESSED FUND 2014 LP; GOLDENTREE DISTRESSED MASTER FUND 2014 LTD.; GOLDENTREE E DISTRESSED DEBT FUND II LP; GOLDENTREE E DISTRESSED MASTER FUND II LP; GOLDENTREE HIGH YIELD VALUE FUND OFFSHORE (STRATEGIC), LTD.; GOLDENTREE HIGH YIELD VALUE MASTER UNIT TRUST; GOLDENTREE INSURANCE FUND SERIES INTERESTS OF THE SALI MULTI-SERIES FUND, LP; GOLDENTREE MASTER FUND, LTD.; GOLDENTREE MULTI-SECTOR FUND OFFSHORE ERISA, LTD.; GOLDENTREE MULTI-SECTOR MASTER FUND ICAV – GOLDENTREE MULTI-SECTOR MASTER FUND PORTFOLIO A; GOLDENTREE STRUCTURED PRODUCTS – C LP; GOLDENTREE STRUCTURED PRODUCTS OPPORTUNITIES FUND EXTENSION HOLDINGS, LLC; GT NM, LP; GUADALUPE FUND, LP; HIGH YIELD AND BANK LOAN SERIES TRUST; LOUISIANA STATE EMPLOYEES' RETIREMENT SYSTEM; MA MULTI-SECTOR OPPORTUNISTIC FUND, LP; PANDORA SELECT PARTNERS, L.P.; ROCK BLUFF HIGH YIELD PARTNERSHIP, LP; SAN BERNARDINO COUNTY EMPLOYEES RETIREMENT ASSOCIATION; SB SPECIAL SITUATION MASTER FUND SPC-PORTFOLIO D; SCOGGIN INTERNATIONAL FUND, LTD.; SCOGGIN WORLDWIDE FUND LTD.; TACONIC MASTER FUND 1.5 LP; TACONIC OPPORTUNITY MASTER FUND LP; CANYON VALUE REALIZATION MASTER FUND, L.P.; PAROCHIAL EMPLOYEES' RETIREMENT FUND OF LOUISIANA; TILDEN PARK INVESTMENT MASTER FUND LP; WHITEBOX ASYMMETRIC PARTNERS, L.P.; WHITEBOX CAJA BLANCA FUND, LP; WHITEBOX INSTITUTIONAL PARTNERS, L.P.; WHITEBOX MULTI-STRATEGY PARTNERS, L.P.; WHITEBOX TERM CREDIT FUND I L.P.; WINDERMERE IRELAND FUNDS PLC; OFFICIAL COMMITTEE OF UNSECURED CREDITORS; ARISTEIA CAPITAL, LLC; CANYON CAPITAL ADVISORS, LLC; GOLDENTREE ASSENT MANAGEMENT LP; TACONIC CAPITAL ADVISORS, L.P.; TILDEN PARK CAPITAL MANAGEMENT LP; WHITEBOX ADVISORS LLC,

Movants, Appellees,

EDUARDO BHATIA-GAUTIER; JOSE L. DALMAU-SANTIAGO; ROSSANA LOPEZ-LEON; MIGUEL A. NADAL-POWER; CIRILO TIRADO-RIVERA; ANIBAL JOSE TORRES-TORRES; PETER C. HEIN; STEPHEN T. MANGIARACINA; SERVICE EMPLOYEES INTERNATIONAL UNION; UNITED AUTOMOBILE, AEROSPACE &

AGRICULTURAL IMPLEMENT WORKERS OF AMERICA INTERNATIONAL UNION; PETER C. HEIN; GMS GROUP LLC; LAWRENCE B. DVORES; MARK ELLIOTT; COOPERATIVA DE AHORRO Y CREDITO DEL VALENCIANO; CAPITULO AUTORIDAD DE CARRETERAS; CAPITULO INSTITUTO DE CULTURA PUERTORRIQUENA; CAPITULO DE OFICINA DESARROLLO SOCIOECONOMICO Y COMUNITARIO; CAPITULO OFICINA DEL PROCURADOR DEL VETERANO; CAPITULO DE JUBILADOS; MOVIMIENTO DE CONCERTACION CIUDADANA INC.; RENE PINTO-LUGO; UNION DE EMPLEADOS DE OFICINA Y PROFESIONALES DE LA AUTORIDAD DE EDIFICIOS PUBLICOS; UNION INSULAR DE TRABAJADORES INDUSTRIALES Y CONSTRUCCIONES ELECTRICAS INC.; UNION INDEPENDIENTE DE EMPLEADOS DE LA AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS; UNION DE EMPLEADOS DE OFICINA COMERCIO Y RAMAS ANEXAS, PUERTOS; UNION DE EMPLEADOS PROFESIONALES INDEPENDIENTES; UNION NACIONAL DE EDUCADORES Y TRABAJADORES DE LA EDUCACION; ASOCIACION DE INNSPECTORES DE JUEGOS DE AZAR; MANUEL NATAL-ALBELO,

Movants.

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Laura Taylor Swain,* U.S. District Judge]

———————

Before

Howard, Chief Judge,
and Kayatta, Circuit Judge.**

———————

Guillermo J. Ramos-Luiña for appellants.
Martin J. Bienenstock, with whom Stephen L. Ratner, Jeffrey W. Levitan, Brian S. Rosen, Mark. D. Harris, Timothy W. Mungovan, John E. Roberts, Adam L. Deming, Michael A. Firestein, Lary A. Rappaport, Proskauer Rose LLP were on brief, for debtors-appellees.
Peter M. Friedman, with whom John J. Rapisardi, Suzanne Uhland, and O'Melveny & Myers LLP were on brief, for appellee

———————

* Of the Southern District of New York, sitting by designation.

** Judge Torruella heard oral argument in this matter and participated in the semble, but he did not participate in the issuance of the panel's decision. The remaining two panelists therefore issued the opinion pursuant to 28 U.S.C. § 46(d).

Puerto Rico Fiscal Agency and Financial Advisory Authority.

David M. Cooper, with whom Susheel Kirpalani, Quinn Emanuel Urquhart & Sullivan LLP, Rafael Escalera, Sylvia M. Arizmendi, Carlos R. Rivera-Ortiz, Reichard & Escalera LLC were on brief, for movants-appellees.

_____

March 2, 2021

_____

**KAYATTA**, <u>Circuit Judge</u>.  We consider another appeal arising out of the Title III debt-restructuring proceedings commenced by the Financial Oversight and Management Board for Puerto Rico ("the Board") on behalf of the Puerto Rico Sales Tax Financing Corporation (COFINA) under the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA), 48 U.S.C. §§ 2101-2241.  Following the initiation of the Title III proceedings, appellants -- various Puerto Rican credit unions ("the Credit Unions") -- filed an adversary proceeding against several defendants, including the Commonwealth of Puerto Rico, the Government Development Bank for Puerto Rico, and COFINA.  While that adversary proceeding was pending, the Board proposed a plan of adjustment ("the Plan") restructuring COFINA's debt by, among other things, resolving disputes between COFINA and the Commonwealth of Puerto Rico and between the junior and senior holders of COFINA's outstanding debt.  As most relevant here, over the Credit Unions' objection, the Plan as finally approved also called for the dismissal with prejudice of all litigation against COFINA that arose prior to the Plan's effective date.  The Credit Unions failed to seek a stay of the order approving the Plan and dismissing their claims against COFINA.  The Plan has now been fully implemented for over two years and given rise to transactions involving billions of dollars and tens of thousands of individuals.

- 5 -

For the following reasons, we now dismiss this appeal as equitably moot.

I.

We have previously chronicled the contentious fight over Puerto Rico's sales and use tax revenues ("SUT revenues"), which spurred the Title III proceedings to restructure COFINA. See Pinto-Lugo v. Fin. Oversight & Mgmt. Bd., Nos. 19-1181, 19-1182, 19-1960, 2021 WL 438891, at *1-4 (1st Cir. Feb. 8, 2021). So we repeat only those facts critical to this appeal.

The Commonwealth of Puerto Rico has long been in the midst of what Congress has described as a "fiscal emergency." 48 U.S.C. § 2194(m)(1). In 2006, to address its inability to fill budget shortfalls by issuing general obligation bonds ("GO bonds"), the Commonwealth passed Act 91, which established COFINA, a public corporation independent from the Commonwealth with the purpose of issuing non-recourse bonds. See P.R. Laws Ann. tit. 13, §§ 11a-16. Act 91 financed COFINA bonds by pledging a certain percentage of the Commonwealth's SUT revenues to the payment of COFINA bondholders. Conflict over those SUT revenues eventually led to litigation between the Commonwealth, COFINA bondholders, and GO bondholders, the latter of whom claimed that the SUT revenues were "available revenues" which must first be used to satisfy general public debt under Puerto Rico's Constitution, P.R. Const. art. VI, § 8. See Lex Claims, LLC v. Fin. Oversight & Mgmt.

- 6 -

<u>Bd.</u>, 853 F.3d 548, 550-51 (1st Cir. 2017). To resolve this dispute, the Board initiated Title III proceedings on May 5, 2017. As of that date, the aggregate outstanding principal and interest on COFINA bonds totaled over $17 billion, a significant portion of the Commonwealth's sizeable public debt.

On March 22, 2018, while those Title III proceedings were ongoing, the Credit Unions filed an adversary complaint. They alleged that prior to the Title III proceedings, the Commonwealth, COFINA, and other Puerto Rico government entities fraudulently induced the Credit Unions to purchase COFINA bonds. The Credit Unions later amended their complaint to add a claim alleging a violation of the Takings Clause of the United States Constitution. They also asserted that the claims raised in the adversary proceeding are non-dischargeable because they alleged violations of constitutional rights and conduct of a fraudulent nature.

Meanwhile, mediation in the Title III proceedings led to a settlement between COFINA and the Commonwealth, which allocated 53.65% of the SUT revenues to COFINA and the remainder to the Commonwealth, and between junior and senior COFINA bondholders, resolving competing claims to the payments that a reorganized COFINA would make in the future. Those settlements formed the basis of the Plan, which provided for a complete restructuring of COFINA's debt. The Plan also discharged all claims against COFINA and provided for the dismissal with prejudice of all litigation

arising from the COFINA restructuring.  In that regard, the Plan stated that "the releases, injunctions and exculpation . . . constitute an essential component of the compromises reached and are not severable from the other provisions of this Plan."

The Credit Unions objected to the Plan's discharge of all claims against COFINA, arguing that the discharge should be narrowed to exclude the claims they asserted against COFINA and other governmental entities in their adversary proceeding, which was (and remains) at the pleading stage.  In response, the Plan was amended to clarify that the Credit Unions were "entitled to continue pursuit" of their adversary proceeding "against all parties other than COFINA and Reorganized COFINA."

After hearing argument on January 16 and 17, 2019, the Title III court overruled all objections to the Plan and, on February 5, 2019, entered its final approval.  Because no party objected to the Plan's waiver of the typical fourteen-day stay or otherwise asked the Title III court to stay approval pending any appeal, the Plan was implemented beginning on February 12, 2019.

One week later, the Credit Unions moved for reconsideration of the confirmation order, seeking to strike the provision releasing the claims they asserted against COFINA in their adversary proceeding.  The Title III court denied the motion. The court explained that the discharge of claims against COFINA "is a fundamental component of the Plan and of restructuring

proceedings in general" and found that removing the discharge provision would cause COFINA "substantial" prejudice, "as the uncertainty presented by pending litigation after confirmation of a plan would frustrate the purpose of these Title III proceedings and could adversely impact the marketability of new bonds issued pursuant to the Plan."  This appeal followed one month later.

## II.

### A.

The Board and an intervening coalition of senior COFINA bondholders urge us to dismiss this appeal under the doctrine of equitable mootness.  Under that doctrine, we have long recognized that "where a reorganization plan has been in place for an extended period of time after thorough vetting and approval by the bankruptcy court, there comes a point where 'the impracticability of fashioning fair and effective judicial relief' cautions against disturbing the reorganization plan."  United Sur. & Indem. Co. v. López-Muñoz (In re López-Muñoz), 983 F.3d 69, 72 (1st Cir. 2020) (quoting Rochman v. Ne. Utils. Serv. Grp. (In re Pub. Serv. Co. of N.H.), 963 F.2d 469, 471 (1st Cir. 1992)).  And just recently, we discussed the doctrine at length in Pinto-Lugo, a set of appeals contesting the same plan of adjustment challenged by the Credit Unions here.  See 2021 WL 438891, at *4-11.  As we explained in Pinto-Lugo, the decision

- 9 -

> whether to reject an appeal of an order
> confirming a plan of reorganization because
> the plan has been implemented calls for us to
> consider at least three factors: "(1) whether
> the appellant pursued with diligence all
> available remedies to obtain a stay of
> execution of the objectionable order;
> (2) whether the challenged plan proceeded to
> a point well beyond any practicable appellate
> annulment; and (3) whether providing relief
> would harm innocent third parties."

Id. at *4 (internal quotation marks and alterations omitted) (emphasis in original) (quoting PPUC Pa. Pub. Util. Comm'n v. Gangi, 874 F.3d 33, 37 (1st Cir. 2017)).

Analyzing those factors, we dismissed the Pinto-Lugo objectors' challenges to the Plan as equitably moot. We found that the first factor cut sharply against the objectors because they "failed to object to the waiver of the automatic stay of confirmation, did not seek any stay pending appeal, neither sought to expedite the appeal nor objected to requests for extension, and in fact sought to extend the briefing schedule themselves." Id. at *9. As to the second factor, we explained that the Plan could not feasibly be unwound:

> Pursuant to the Plan and new bond legislation,
> upon consummation of the Plan old COFINA bonds
> worth over $17 billion were exchanged for
> reorganized COFINA bonds worth over
> $12 billion. Those new COFINA bonds have
> since changed hands tens of thousands of times
> on the open market for over a year, with many
> now held by strangers to these proceedings.
> In addition, COFINA distributed about
> $322 million to creditors, Bank of New York
> Mellon (BNYM), as trustee, transferred more

> than $1 billion in disputed SUT revenues to the Commonwealth and COFINA, and insurers of the old bonds have paid holders of old bonds under the Plan. Complicating matters further, claims have been released and all litigation arising from the restructuring has been dismissed with prejudice.

Id. at *8. The third factor also weighed in favor of equitable mootness, given the "incalculable inequity" that unraveling the plan would cause to "many thousands of innocent third parties who have extended credit, settled claims, relinquished collateral and transferred or acquired property in legitimate reliance on the unstayed order of confirmation." Id. (quoting In re Pub. Serv. Co. of N.H., 963 F.2d at 475).

This appeal suffers from the same problems. As in Pinto-Lugo, the Credit Unions here were anything but diligent in seeking to obtain a stay or prevent delay: They failed to object to the waiver of the automatic stay of confirmation, to seek any stay pending appeal, to request to expedite the appeal, or to object to requests for extension. In fact, on multiple occasions the Credit Unions sought to extend the briefing schedule themselves. As to the second and third factors, the Credit Unions challenge the same plan that the objectors in Pinto-Lugo sought to overturn, a plan which has now been fully implemented for over two years and which has led to tens of thousands of transactions worth billions of dollars by third parties relying on it in good faith. Upsetting

- 11 -

the Plan at this late date would throw those transactions into doubt, harming those third parties.

**B.**

Notwithstanding the foregoing, the Credit Unions make six arguments why equitable mootness is inapplicable to their appeal. First, they contend that the doctrine is inapplicable to proceedings under PROMESA. Yet we rejected this same argument in Pinto-Lugo, explaining that nothing in PROMESA undercuts the equitable nature of a proceeding to approve a plan of adjustment and that the interests of finality and reliance that undergird the doctrine in the context of Chapter 9 and 11 bankruptcies apply with equal force to proceedings under Title III. See 2021 WL 438891, at *6.

Second, the Credit Unions argue that the nature of their claims cautions against application of the doctrine. To the extent the Credit Unions rely on the constitutional nature of their claims, we have previously held that "the presence of underlying constitutional claims does not act as a per se bar to the applicability of the doctrine" of equitable mootness. Id. at *7 (applying the doctrine despite the presence of constitutional claims). This is because a "'constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.'" Henderson v.

- 12 -

United States, 568 U.S. 266, 271 (2013) (quoting United States v. Olano, 507 U.S. 725, 731 (1993)); see also Bennett v. Jefferson Cnty., 899 F.3d 1240, 1251 (11th Cir. 2018) (applying equitable mootness despite the presence of state-based constitutional claims and explaining that "the mere fact that a potential or actual violation of a constitutional right exists does not generally excuse a party's failure to comply with procedural rules for assertion of the right").  Similarly, the Credit Unions' reliance on the allegedly non-dischargeable nature of their claims goes to the merits of their objections to plan approval rather than to the ramifications of their failures to try to forestall plan implementation.  And while the merits of an objection may perhaps play some role in weighing the pros and cons of the equitable relief being sought, certainly the merits cannot be determinative.  Otherwise, equitable mootness would apply only when not needed.  See Pinto-Lugo, 2021 WL 438891, at *9.

Third, the Credit Unions contend that dismissing their appeal as equitably moot would violate their due process right to appeal.  Suffice to say, if this were so, the doctrine of equitable mootness -- which every circuit has adopted in some form, see id. at *4 -- would not exist.  More to the point, the Credit Unions have not been denied any right to appeal.  To the contrary, they have briefed their case and presented oral argument on the various issues raised by their appeal.  Although in denying this appeal as

- 13 -

equitably moot we will not reach the merits of those issues, that does not amount to a denial of the Credit Unions' right to due process, just as dismissal of a cause of action based on an affirmative defense such as laches does not violate a litigant's right to due process.

Fourth, the Credit Unions vaguely assert that the Plan's confirmation was "steamrolled," presumably suggesting that the Plan proponents have unclean hands. But, as noted, the Credit Unions received notice of the Plan, objected to it in writing, participated in the confirmation hearing, and had their objection heard and addressed by the court. They were "steamrolled" only in that they lost quickly.

Fifth, trying to fight fire with fire, the Credit Unions argue that appellees are equitably estopped from asserting that the Credit Unions' claims are equitably moot because appellees "represented that in the confirmation process [the Credit Unions] should have had the opportunity to assert them." Specifically, the Credit Unions point to appellees' contention in the adversary proceeding that "[u]ntil a plan of adjustment is filed that does not provide for payment in full of any claims [the Credit Unions] may have, any decisions on (or requests related to) dischargeability are premature." That assertion, however, was correct: Had the Plan allowed the Credit Unions' claims, there would have been no need to litigate dischargeability. And, as we

have repeatedly noted, the Credit Unions had ample opportunity to object to the discharge before the Title III court.

Finally, the Credit Unions argue that their protection and the protection of their members and depositors "would be aligned with the policy objectives of a Plan of Adjustment," and so the "failure to protect [them] and their members . . . would defeat" the purpose of the Plan. But reversing the order approving the Plan would by no means inevitably provide any benefit to the Credit Unions and their members. It would imperil the roughly 50% of bond value preserved by the Plan. See Pinto-Lugo, 2021 WL 438891, at *2. And it would leave the Credit Unions with a claim against a debtor that could well have no assets with which to pay unsecured claims. In any event, trying to undo the Plan at this point would hardly further the Plan's policy objectives. To the contrary, it would reverse or at least call into question the "important forward motion" the Plan provides to "the Commonwealth's economic recovery." Id. at *8.

## C.

Unable to show that the equitable mootness doctrine is inapplicable to their case, the Credit Unions assert a variety of reasons why the equitable mootness factors do not actually favor dismissal.

As to "whether the appellant pursued with diligence all available remedies to obtain a stay of execution of the

- 15 -

objectionable order," id., at *4 (alteration omitted) (emphasis in original) (quoting PPUC Pa. Pub. Util. Comm'n, 874 F.3d at 37), the Credit Unions do not contest that they repeatedly failed to seek a stay of the confirmation order. Rather, they argue that "preservation of [their] rights did not require staying the Plan . . . but merely limiting the releases and discharge to be granted to COFINA." This argument, however, ignores the fact that the discharge could only be limited by modifying the Plan. The Credit Unions also argue that they timely sought to challenge the Plan through the filing of their objections and by their oral presentation at the confirmation hearing. But objecting to the merits of a Plan is simply not the same as asking that the Plan approval order be stayed while those objections are considered on appeal.

The Credit Unions next take issue with "whether providing relief would harm innocent third parties." PPUC Pa. Pub. Util. Comm'n, 874 F.3d at 37. In that regard, they argue that because "COFINA provides no public services, no citizens . . . [would] be affected by the modification or delay of the Plan." Along similar lines, they contend that the third parties trading COFINA bonds, particularly certain hedge funds, are not "innocent" parties but instead were "active participants in the use of the bankruptcy proceeding to profit at the expense of" COFINA and its "traditional investors." But the restructured

COFINA bonds are traded on public markets and have changed hands tens of thousands of times since confirmation of the Plan. It is simply implausible that all, or even most, current COFINA bondholders were involved in the Title III proceedings. And given the existence of these numerous innocent third parties, whether COFINA itself provides public services is irrelevant.

Undeterred, the Credit Unions point to provisions of the Plan that exclude certain claims against BNYM, the bond trustee, from the releases, and suggest that if those claims are permissible, then the continuation of their claims against COFINA would not disrupt the Plan. Those provisions, however, do not permit any claims against COFINA. Indeed, every claim against COFINA, to the extent not satisfied in full, was discharged by the Plan. The fact that the Plan permits certain claims against BNYM, just as it allows the Credit Unions' claims against non-COFINA defendants, in no way suggests that permitting the Credit Unions to pursue claims against COFINA would not disrupt the Plan or the marketability of COFINA bonds.

The Credit Unions also contend that there is no evidentiary support for the idea that permitting their claims would upend the Plan. We long ago noted, however, that "substantial consummation" of a plan of reorganization "raises a 'strong presumption' that an appellate court will not be able to fashion an equitable and effective remedy." In re Pub. Serv. Co. of N.H.,

963 F.2d at 473 n.13 (quoting In re AOV Indus., Inc., 792 F.2d 1140, 1149 (D.C. Cir. 1986)). On top of that presumption, the Plan states that "the releases, injunctions and exculpation . . . constitute an essential component of the compromises reached and are not severable from the other provisions of this Plan." See In re Millennium Lab Holdings II, LLC, 945 F.3d 126, 143 (3d Cir. 2019) (holding that "striking the release provisions as to Voya would certainly undermine the plan" because "the plan says that the settlement payment . . . could not be compelled absent full and complete releases from all of Millennium's pre-bankruptcy lenders, including Voya" (emphasis in original)); see also In re Charter Commc'ns, Inc., 691 F.3d 476, 485 (2d Cir. 2012) (noting that, although "a nonseverability clause standing on its own cannot support a finding of equitable mootness," such a clause "may be one indication that a particular term was important to the bargaining parties").

Additionally, in approving the Plan, the Title III court found that the Plan

> incorporates a complex series of interrelated compromises and settlements that resolve the most significant potential obstacle to confirmation of a plan of adjustment. Moreover, since the compromises and settlements are inextricably interwoven, they all hinge on one another and the approval of all of these compromises and settlements is required in order to satisfy the conditions to the Effective Date set forth in the Plan.

- 18 -

And, as we have already explained, in denying the Credit Unions' motion for reconsideration, the court further found that the release of claims against COFINA "is a fundamental component of the Plan" and that removing the release would cause COFINA "substantial" prejudice, "as the uncertainty presented by pending litigation after confirmation of a plan would frustrate the purpose of these Title III proceedings and could adversely impact the marketability of new bonds issued pursuant to the Plan."

The Credit Unions' only response to these findings is that the financial value of the relief they seek amounts to only four tenths of one percent of the restructured debt of COFINA. We rejected a similar argument in Pinto-Lugo, declining to grant relief involving amounts only slightly larger (in relation to the $12 billion of restructured COFINA debt) than those claimed by the Credit Unions. We did so because the Plan

> rested at base on the [Title III] court's approval of a settlement between the Commonwealth and COFINA pursuant to which the Commonwealth retained 46.35% of SUT revenues. The Title III court could approve or disapprove the plan; no one explains how the Title III court could have successfully compelled the Commonwealth to settle its adversary proceeding against COFINA for less than the 46.35% provided for in the approved settlement. See 48 U.S.C. § 2165. So it would seem to follow that we, too, could not "tweak" the plan by ordering the Commonwealth to settle for 46.35% minus $316 million. In short, we face an up-or-down decision -- affirm or vacate Plan approval. And because no one sought a stay of the plan approval,

> vacating approval is precisely what would trigger a hopeless effort to unscramble the eggs.

2021 WL 438891 at *10.

So too here, the Credit Unions fail to explain how the Title III court could successfully compel COFINA to accept the Plan without the release of all claims against it, particularly in light of the COFINA-Commonwealth settlement's carefully calibrated division of SUT revenues, which could be upset if the release were modified as the Credit Unions request. See 48 U.S.C. § 2165. Nor do the Credit Unions explain how their recovery from COFINA of a judgment of many millions of dollars would not adversely affect the thousands of innocent purchasers of new COFINA bonds. So it would seem to follow that we face the same up-or-down decision we faced in Pinto-Lugo -- affirm or vacate Plan approval. This conclusion is further confirmed by the Credit Unions' own description of relief they seek on appeal, which recognizes that the "Judgment confirming COFINA's plan of adjustment must be reversed" before any modification of the Plan would be possible. But just as in Pinto-Lugo, because the Credit Unions failed to seek a stay of the Plan's implementation, granting such relief would be as futile as squeezing the toothpaste back into the tube. See In re Specialty Equip. Cos., 3 F.3d 1043, 1049 (7th Cir. 1993) (dismissing appeal as equitably moot because nullification of non-

debtor third-party releases "would amount to imposing a different plan of reorganization on the parties").

The Credit Unions also point to <u>Samson Energy Resources Co.</u> v. <u>Semcrude, L.P.</u>, in which the Third Circuit rejected an attempt to dismiss an appeal as equitably moot. 728 F.3d 314 (3d Cir. 2013). In <u>Samson</u>, the appellants sought to modify a confirmed Chapter 11 plan so that they could go forward with an adversary proceeding. The amount at issue was only $207,300, approximately 0.13% of the funds set aside under the plan for the class to which the appellants belonged and just 0.01% of the $2 billion reorganized by the plan. <u>Id.</u> at 324.[1] Given the small amounts at issue and the debtor's "robust financial health" post-bankruptcy, <u>id.</u> at 325, the court found that the debtor's financial well-being would not be threatened by allowing appellant's claims to proceed, <u>id.</u> at 325-26, nor would any other third-party be negatively impacted, <u>id.</u> The court also found that there was no risk that allowing the appellants' claims to proceed would lead to any other claims against the debtor. <u>Id.</u> at 324.

---

[1] Although the appellants' adversary proceeding was a putative class action with potential liability of approximately forty to eighty million dollars, no class had been certified at the time of the appeal, nor was it clear how many of the class members' claims may have been precluded due to their acquiescence to the plan of reorganization. <u>Id.</u> Without more clarity about the class, the court found premature any fears of upending the plan of reorganization. <u>Id.</u> at 324-25.

Here, by contrast, there is no reason to expect that COFINA would have anywhere near the available unpledged funds necessary even to begin paying the Credit Unions' claims. There would also be no principled basis for allowing the Credit Unions' claims to proceed and not allowing, for example, the claims of the Elliott objectors in Pinto-Lugo. While the sums claimed by the Credit Unions and the Elliott objectors are small in relation to the amount of pledged revenues that flow through COFINA, they could still result in liability on the order of nine figures. Such substantial liability might well threaten COFINA's solvency, given its inability to divert pledged SUT revenues, thereby upsetting the central aim of the Plan. And, as set forth above, the Title III court specifically found that permitting the Credit Unions' claims could disrupt the marketability of the restructured COFINA bonds, which would harm tens of thousands of innocent bondholders and threaten the Commonwealth's economic recovery. Furthermore, if the claims are valid, then the Credit Unions offer no reason why liability would not inure to the Commonwealth, which would be more likely to have assets to pay than would COFINA. Because, as we have noted, the Plan does not bar proceeding against anyone other than COFINA, the practical harm to the Credit Unions would appear to be speculative.

Finally, the Credit Unions argue that one of the purposes of equitable mootness -- finality of confirmed plans of

reorganization -- would not be served by denial of this appeal because "Puerto Rico's fiscal crisis will not be resolved by COFINA's Plan of Adjustment." Expanding on this argument, the Credit Unions note that Title III proceedings regarding the Commonwealth and other governmental agencies are ongoing and that unspecified issues surrounding COFINA's plan of adjustment are still being litigated. Similarly, the Credit Unions argue that "[m]arket participants are aware that finality is only achieved upon exhaustion of all legal remedies and expiration of all applicable terms" and that restructured COFINA bonds are "subject to market risks." Yet we have long affirmed the "important public policy favoring orderly reorganization and settlement of debtor estates by 'affording finality to the judgments of the bankruptcy court.'" In re Pub. Serv. Co. of N.H., 963 F.2d at 471-72 (quoting In re AOV Indus., Inc., 792 F.2d at 1147). Furthermore, that other proceedings may be ongoing or that Puerto Rico's fiscal recovery remains a work in progress does not change the fact that the Plan has been fully implemented for over two years. Whatever risks market forces or those other proceedings may pose to Puerto Rico's recovery, we decline to add to those risks by ruling in favor of parties who, by their inaction, rendered the relief they seek impossible without causing harm to many other innocent parties and the public.

## III.

For the foregoing reasons, we <u>dismiss</u> as equitably moot the Credit Unions' challenge to the Title III court's confirmation of the Plan.